ANTHONY LAWRENCE, Respondent, v CITY OF NEW YORK, Appellant.

Second Department, August 24, 1981

APPEARANCES OF COUNSEL

*Allen G. Schwartz*, Corporation Counsel (*Trudi Mara Schleifer* and *Ronald E. Sternberg* of counsel), for appellant.

*Lipsig, Sullivan & Liapakis, P. C.* (*Michael N. Block* and *Pamela Anagnos Liapakis* of counsel), for respondent.

### OPINION OF THE COURT

TITONE, J. P.

On February 2, 1971, plaintiff was employed as a fireman by the New York City Fire Department. While on a break in the backyard of premises where he and other fire

fighters had been fighting a fire in the building thereon, plaintiff was struck by a couch pushed or thrown from the building. On or about February 8, 1972, plaintiff brought the within action against the appellant City of New York (hereinafter the city). An amended complaint was served on or about May 24, 1978.

Although there was some evidence respecting the failure of the city to have had a lookout stationed on the ground below in preparation for defenestration of smoldering items that might reignite the building, the thrust of plaintiff's case at the trial, limited to the issue of liability, was directed toward the alleged negligence of those who threw or pushed the couch from the building.

At the end of the trial, the jury, in response to interrogatories, held that the negligence of the city had been the proximate cause of the accident, and that plaintiff had not been guilty of contributory negligence nor had he assumed the risk of the incident which caused the injuries.

## ISSUES RAISED ON APPEAL

Involved in all the points raised on appeal is the common-law fellow-servant rule. The rule, stated by the Court of Appeals in *Loughlin v State of New York* (105 NY 159, 162-163) is summarized as follows:

If the coservant, whose act caused the injury, was at the time representing the master in doing the master's duty, the master is liable. If, on the other hand, the coservant was simply performing the work of a servant, merely in his character as a servant or employee, the master is not liable. Moreover, the fact that the person whose negligence caused the injury was a servant of a higher grade than the servant injured, or that the latter was subject to the direction of the former, and was engaged at the time in executing the orders of the former, does not take the case out of the operation of the general rule, nor make the master liable.

On appeal the city asserts that the fellow-servant rule bars the instant action against it by plaintiff.[1] The plain-

---

1. Although the city did amend its answer at trial to interpose the defense of workers' compensation, it specifically does not take issue on appeal with a ruling by the Trial Judge after trial that such defense is not applicable to New York City fire fighters.

tiff responds by arguing that assuming the fellow-servant rule is still viable, it is not a bar to the action because (a) the duty to warn plaintiff, under the circumstances, was a nondelegable duty which was breached by the city as his employer, and (b) the jury specifically found that plaintiff did not assume the risks of the occurrence. Plaintiff also contends that the fellow-servant rule, being out of harmony with present day public policy, is obsolete and no longer viable as a bar to an action such as this one.

## PLAINTIFF'S PLEADINGS

In paragraph 10 of the original and amended complaints, plaintiff alleged that the accident was caused by the negligence of the city in "negligently and carelessly throwing a couch from the window * * * without any signal, notice, or warning to plaintiff of the operations being conducted by the members of the Fire Department * * * in failing to warn or alert the plaintiff of the fact that the couch was to be thrown from the said window".

## TRIAL

The opening statement to the jury by plaintiff's counsel focused upon the negligence of an unknown fire fighter or fire fighters in throwing a couch out of the window without warning persons below. He did not mention or suggest any additional theory concerning the failure of the city to have "traffic" direction at the ground level for items being thrown from the building.

During the trial itself, evidence was adduced that the fire to which plaintiff responded at or about 9:15 A.M. on the date in question, was at a two-story building on East New York Avenue in Brooklyn. After fighting the fire for about half an hour, plaintiff and other fire fighters were directed by their superior, Lieutenant Erhard, to take a standard break outside the building in the backyard. About 5 or 10 minutes after he went to the yard, and while he was removing a tree limb or log which was obstructing the movements of fellow fire fighters, plaintiff was struck without warning by a smoldering sofa thrown or pushed from the building. The blow rendered him unconscious. Other than testimony

from plaintiff that proper procedure required the crew to watch out and give warning during defenestration, and Lieutenant Erhard's statement that proper procedure required "probably a man stationed downstairs", there was little significant evidence adduced respecting the existence of anyone who might have been assigned to warn fire fighters of matter being pushed or thrown from the building.

The narrow focus of plaintiff's case, i.e., negligence of fellow fire fighters in throwing or pushing the couch out of the window, was continued by his counsel on summation. According to his counsel, "the plaintiff * * * was injured, not through his own fault, not through anything he assumed, but due to the negligence of a fireman employed by the City of New York." In fact, counsel conceivably repudiated the secondary theory respecting traffic direction from the ground level when he also stated:

"He [Erhard] specifically testified it was improper to simply throw it out without giving any indication. He said what you do is you go—you *look* outside, certainly, and if men are out, you say to a man, 'Go downstairs and move the men away,' or at the very least, you give them a warning.

"Now Mr. Weiler [defense counsel] said there was no officer downstairs. *You don't need an officer* to say 'Fellows, look out. We are going to toss something out of the building.' You don't need an officer to say, 'Come on, guys, let's move away. There is something there that is smoldering.' There is no testimony that this couch was on fire * * *

"Even if it was burning, this was not a blazing inferno; this was a couch. They could have simply said, 'You, Fireman Lawrence, Fireman Murphy, Fireman Grey, move away. We are tossing this couch out of the window.'

"That, I submit, would have been proper procedure. That would have been reasonable * * * [H]e was a fireman doing his job, and he got hurt because of the negligence of other firemen, which is what I told you during voir dire when we picked the jury * * * which is what I'm telling you now, and it's not because I say it, and it's not because Tony Lawrence says it; it's because the evidence compels that finding, the evidence which you are about to consider." (Emphasis supplied.)

### TRIAL COURT'S DECISION ON MOTION TO DISMISS

After the jury rendered its verdict in favor of plaintiff on the issue of liability, the trial court, *inter alia*, denied defendant's motion to set aside the verdict and dismiss the complaint based upon the defense that the plaintiff is barred from recovery under the fellow-servant rule.

### DISCUSSION AND DETERMINATION ON APPEAL

At the outset, it should be observed that had plaintiff brought this action within one year of the accident,[2] it is conceivable that he would have prevailed because of provisions of subdivision 2 of section 2 of the Employers' Liability Law, to wit:

"§ 2. Employers' liability for injuries

"When personal injury is caused to an employee who is himself in the exercise of due care and diligence at the time: * * *

"2. By reason of the negligence of any person in the service of the employer intrusted with any superintendence or by reason of the negligence of any person instrusted with authority to direct, control or command any employee in the performance of the duty of such employee, the employee * * * shall have the same right of compensation and remedies against the employer as if the employee had not been an employee of nor in the service of the employer nor engaged in his work."

The intent of subdivision 2 of section 2 of the Employers' Liability Law is that so far as it pertains to the negligence of a superintendent, the fellow-servant doctrine does not apply *(Bellegarde v Union Bag & Paper Co.*, 90 App Div 577, affd 181 NY 519). The superintendence rule set forth in the statute probably would have inured to plaintiff's benefit had the action been timely brought thereunder, assuming that one of plaintiff's theories of liability was based upon the fire department's failure to have a superior officer direct traffic in the jettisoning of items such as a couch or

---

2. Section 3 of the Employers' Liability Law, entitled "Notice to be served", provides that an action under such law must be commenced "within one year after the occurrence of the accident causing the injury or death."

sofa. Although the record is sparse, and perhaps barren of evidence that such failure was the result of insufficient supervision at the scene of the fire, Lieutenant Erhard did testify at the trial that proper procedure required someone on duty in that capacity. Moreover, in summation, trial counsel for the city conceded the lack of a traffic controller on the scene.

In any event, since the Employers' Liability Law does not apply to this case because of the time bar, in order for plaintiff to prevail on appeal, this court must concur in essence with at least one of the three arguments advanced by plaintiff, to wit: (1) the nondelegable duty of the city as an employer renders the fellow-servant rule inapplicable; (2) the finding of the jury that plaintiff did not assume the risk likewise renders the fellow-servant rule inapplicable; and (3) the fellow-servant rule is no longer viable.

## (1) NONDELEGABLE DUTY OF THE CITY

It has been stated as a general rule that personal or absolute duties of a master cannot be delegated by him to a servant so as to relieve himself from liability on the ground that the negligence with respect thereto was that of a fellow servant. Such duties are usually termed "nondelegable duties", and the servant on whom they are imposed is, in the exercise of such duties, a representative of the master, or a vice-principal. If the specific act complained of is one which can properly be regarded as within the personal duty of the master, he is liable without regard to whether it was an act of negligent performance or one of omission. Amongst nondelegable duties devolving upon a master are the responsibility of furnishing servants a safe place to work in the first instance, keeping or maintaining such place of work reasonably safe, and furnishing safe tools, machinery and other appliances (56 CJS, Master and Servant, § 333; cf. *Loughlin v State of New York*, 105 NY 159, *supra*).

On the other hand a servant is not considered a vice-principal where he is supervising or carrying out executory details of the work, such as where he is not performing a duty which the law imposes upon the master, or a duty such

individual owes only to the master (56 CJS, Master and Servant, § 333; cf. *Loughlin v State of New York, supra*). However, notwithstanding the corollary to the rule that the line of demarcation between the absolute duty of the master and the duty of the servants is the line that separates the work of construction, preparation and preservation from the work of operation, difficulty has often been encountered in determining whether the duty neglected in the particular case is that of the master or is the duty of a servant relating merely to the details of the work (56 CJS, Master and Servant, § 333; *Hankins v New York, Lake Erie & Western R. R. Co.*, 142 NY 416, 420-421; *Ell v Northern Pacific R. R. Co.*, 1 ND 336). As aptly stated by the Court of Appeals in *Hankins* (p 421) : "Its [the nondelegable rule's] application to a particular case is sometimes difficult, and the boundary line between an act of the master and an act of the employee is sometimes quite vague and shadowy."[3]

Plaintiff relies on *Carey Reed Co. v McDavid* (120 F2d 843), a Fifth Circuit case decided in 1941 under Mississippi law, to support his nondelegable duty argument. In *Carey Reed* plaintiff was injured when a motor-driven dipper was dropped on his head while he went about his duties shoveling gravel in a railroad car. The Fifth Circuit held that the master could be held liable even though proximate cause of the injury was a fellow worker's failure, as the "spotter", to warn plaintiff about the dipper's position. The basis of liability was the court's conclusion that the master's duty to warn the plaintiff when the dipper was swung into the car was nondelegable. It opined that since plaintiff could not shovel the gravel about in the car and at the same time be aware of the position of the mechanized dipper above him it was necessary for the employer to have a spotter warn

3. Stronger language pertaining to the rule was used by the Supreme Court of North Dakota in *Ell v Northern Pacific R. R. Co.* (1 ND 336, 343) ; "This issue of law we are to determine, and our investigation must run along the line of general principles; for the adjudications upon this subject—so multitudinous as almost to warrant the simile, 'thick as autumnal leaves that strew the brooks in Vallambrosa'—these adjudications are so discordant, enumerating so many rules, stating so many limitations, applying the law to facts so diverse, that one is reminded of Gibbon's remark upon the infinite variety of laws and opinions when Justinian entered upon the reform of codification—that they were beyond the power of any capacity to digest."

plaintiff of the movement of the dipper, which apparently was being operated by a third employee from outside the car. In essence the Fifth Circuit held that the master was required to furnish the plaintiff with a safe place to work and the obligation to be diligent about giving warning was continuous. Thus, the master's duty was not performed by ordering another servant to give the warning, and the negligence of such other servant in failing to give a warning was imputed to the master.

Although *Carey Reed (supra)* was not based on New York law, it appears that in Mississippi the common-law distinction between the duties of a master and those of a servant was the same as it is in New York, i.e., the master's duties were to provide a safe place to work, tools adequate for the assigned task, and sufficient competent employees, and the servant's duties were to carry out the assigned task, including such decision making as is necessary to carry out various details of the assignment. The distinction is essentially between providing a safe work place and careful conduct of the work itself. As was stated in *Neagle v Syracuse, Binghamton & N. Y. R. R. Co.* (185 NY 270, 274) : "This distinction is of vital importance because the furnishing of a place to work is a part of the master's duty, and in the discharge of that duty he is responsible for the negligence of any of his employees, while as to the conduct of the work he is responsible only for his own negligence or that of his *alter ego*, not for the negligence of a co-servant. *(Loughlin v. State of N.Y.*, 105 N.Y. 159; *Webber* v. *Piper*, 109 id. 496; *Cregan* v. *Marston*, 126 id. 568.) This rule has been somewhat modified by the Employers' Liability Act".

Application of the rule in the instant appeal does not inure to plaintiff's benefit. In most instances courts in this State have refused to characterize acts of supervisory employees in directing fellow employees, as nondelegable acts of the master's duties.

Thus, in *Dair v New York & Porto Rico S. S. Co.* (204 NY 341), the Court of Appeals considered the foreman's act of shifting half the normal complement for unloading trucks to other tasks. Although some of the trucks were handled safely by the smaller crew, eventually a heavy load that

could have been safely handled by the normal complement of men tipped over causing plaintiff to sustain serious personal injuries. The Appellate Division (139 App Div 751) had held that the employer violated a nondelegable duty here, i.e., the placement and not just the mere furnishing of an adequately sized crew. In reversing, the Court of Appeals made the following observation (pp 346-347):

"But assuming that the usual number of eight men should have been in the hold for the handling of loads of ordinary size and to be prepared for the case of extraordinary ones, the question is whether the act of Gleason, the gang foreman, should be imputed to the defendant, as the general employer. Whether Gleason's act, in transferring some of the men from the hold to another part of the work, was a negligent one on his part, or, as he says, one in the exercise of his judgment, how was the defendant at fault? It did not relate to a personal duty of the defendant. The stowing away of the iron in the hold was, obviously, but a detail of the general work of loading the vessel, upon which the gang was engaged; as to performing which experience and observation were the guides. Gleason, though the foreman, was one of the complement of men and a fellow-servant; however in grade above them. He was, himself, trucking the iron from the lighter. Concededly, a sufficient number of men were provided for, and continuously retained upon, the general work of loading the vessel with a cargo of the iron and there is no suggestion that they were not competent workmen. The duty of the defendant, in that respect, was fully discharged and, necessarily, details of the work were left to the men. With equal necessity, their foreman was invested with some measure of discretion and judgment in managing the execution of the work.

"If, in the execution of some detail of the common work, upon which a number of men are employed, an injury is occasioned through the fault of one of them, whether he be the foreman, or not, it is not to be imputed to the employer. When Gleason omitted to keep the eight men in the hold of the vessel, whether it be regarded as negligence on his part, or as an error of judgment, it was the omission of a duty, which rested upon him as a fellow-servant, concerning a detail of the work. The defendant having been careful

to provide a sufficient number of competent workmen, no further duty rested upon it with respect to the distribution of the men in the various phases of the work. It was under no obligation to direct their actions at all moments; or to see to it that the men were kept at their proper stations. This is the rule inferable from many cases, in which a master has committed the management of ordinary work to a co-employé of superior grade, after discharging all those other obligations incumbent upon him, when planning and prescribing the work to be done. *(Besel* v. *N.Y.C. & H.R.R.R. Co.,* 70 N. Y. 171; *Potter* v. *N.Y.C. & H.R.R.R. Co.,* 136 id. 77; *Loughlin* v. *State of New York,* 105 id. 159, 163; *Cullen* v. *Norton,* 126 id. 1; *Madigan* v. *Oceanic Steam Nav. Co.,* 178 id. 242; *Vogel* v. *American Bridge Co.,* 180 id. 373.)"

It should be noted that the Court of Appeals in *Dair* put stress upon what has become the key word in cases in this area of the law, i.e., "details". It stated (204 NY, at p 350): "That was, again, a detail of the work, which the foreman was, solely, responsible for. In principle, the omission of duty in this case is analogous to that of the foreman, who, when the master has supplied some article necessary to the proper performance of the work in sufficient quantity, omits to avail himself of it when there is need and an accident ensues. Whether the omission is attributable to neglect, or to an error of judgment, it relates to a detail of the work and not to a personal duty of the master. (See *Madigan* v. *Oceanic Steam Nav. Co.,* 178 N.Y. 242, 245; *Vogel* v. *American Bridge Co.,* 180 id. 373.)"

At first blush it appears that there has been at least one departure from the New York rule. In *Pantzar v Tilly Foster Iron Min. Co.* (99 NY 368), the Court of Appeals actually permitted recovery when a mass of rock collapsed onto plaintiff because of a defect known to the site superintendent and foreman and which did not represent the culmination of any natural or necessary risk taken in working the mine. However, in *Cullen v Norton* (126 NY 1, 7) the Court of Appeals pointed out that in *Pantzar* the master had been held liable for violation of a duty attributed to it rather than its two servants because plaintiff had been put in a place of danger (1) "not necessarily connected with or part

of the conduct of the general work itself for which plaintiff was employed", and (2) "which danger was not caused by any negligent act or omission of a fellow servant."

The application to the instant case of New York common law, in its full vigor, which means a line of cases from around the turn of the century into the first decade and a half of this century, requires rejection of plaintiff's argument that he was victimized by a breach of any duty chargeable to the master. Though both in *Carey Reed* (120 F2d 843, *supra)* and the case at bar the proximate cause involved a failure to warn, there is nothing to indicate herein that there was a special need for the master, i.e., the city, to provide "eyes" for firemen. In fact, the supervisors at the scene, rather than the city, made decisions as to how smoldering property should be disposed of as part of the details of their work. In the Fifth Circuit case, the only way the work was performed was by provision for a pair of "eyes" (i.e., the spotter) for the worker. Thus there was no on-the-scene decision respecting the details of how to secure the work place in *Carey Reed* as there was in the instant case. Plaintiff himself testified that during the "overhaul" phase of firefighting, which includes taking those steps necessary to ensure that a fire seemingly extinguished will not reignite, it may be necessary *in a particular situation,* to remove objects from the building by throwing them out a window.

"In many cases there are no fixed conditions; the danger waxes and wanes during the progress of the work, and the safety of the group of workmen depends upon the care which other workmen in the same group perform their work. If a master has properly performed the duties of management, he is not responsible for the temporary conditions of unsafety which arise during the progress of the work." (Restatement, Agency 2d, § 500, p 452.)

Therefore, the nondelegable duty theory offered by plaintiff to sustain his verdict against appellant city is unacceptable.

### (2) ASSUMPTION OF RISK

Plaintiff argues on appeal that, in any event, the fellow-servant rule, if still viable in this State, is not applicable in

this case because the jury specifically found that the plaintiff did not assume the risk of the occurrence. He notes that he was assigned to an engine company whose prime responsibility is the extinguishment of fires, that he was on a "break" at the time of the accident at the direction of Lieutenant Erhard, his immediate superior, and that the work of overhauling, which included the throwing of upholstered furniture from a window on the second floor of the building, was conducted by members of a ladder company. Since the responsibilities of a ladder company are distinctive from those of an engine company, argues plaintiff, it is debatable and thus a question of fact whether a member of an engine company is a fellow-servant of a member of a ladder company so as to be within a member of the ladder company's circle of employment for whose negligence such a member assumes the risk. Plaintiff then points out that the jury had concluded that he did not assume the risk of this occurrence. He supports his argument by referring to section 478 of the Restatement of Agency, Second, which holds that implicit in the definition of a fellow-servant is the requirement that the actions of the servants under the circumstances are so related that they are regularly or likely to be in proximity to each other so that there be a special risk of harm to one servant if the other is negligent.

In view of the circumstances herein the argument of plaintiff under this point is without merit. The term "assumption of risk", when applied generally to a servant with respect to his conducting his labors for the master, is distinct from the use of such term with respect to the servant's relations with a fellow servant while engaged with the latter in the conduct of the master's business. As to the former, the defense of assumption of risk is based upon the implied agreement or waiver of the servant, i.e., having the right to retire from work when he is faced with a dangerous condition, the servant, by remaining on the job, impliedly contracts that he will assume the risk of liability from such condition or waives the right to any claim for any resulting injury (Drake v Auburn City Ry. Co., 173 NY 466, 473). Similarly stated, "assumption of risk", vis-à-vis the relation of employee to employer, means that in the absence of a statute to the contrary: "[T]he rule is that

an employee by his very act of entering the service of the employer—by his very contract of employment—assumes the 'ordinary' risks of the service or such risks as usually are incident thereto, and an employee injured solely by reason of such risks has no common-law right of recovery against [an] employer * * * The real foundation rests on the thought that the employee enters the employment voluntarily, knowing the perils to which he subjects himself." (53 Am Jur 2d, Master and Servant, § 265.)

However, the rationale of the term "assumption of risk" as applied to the fellow-servant rule is that: "One who engages in work with others takes the chances, not only of his own negligence, but of the negligence of which his fellow-servants may be guilty; and it is as well settled as any rule can be that he cannot recover from the common master, damages in respect to the negligence of the fellow-servant any more than for damages arising from his own want of care." *(Stringham v Hilton*, 111 NY 188, 198.) The rule does not rest on the ground that the negligence of the co-employee is imputed to the servant, but on the ground it is not imputed to the master *(American Car & Foundry Co. v Uss.*, 211 F 862; 56 CJS, Master and Servant, § 321).

In the case at bar, the record reveals that the jury was asked, under the pertinent interrogatory, to determine whether plaintiff assumed the *"risk of the incident"*, i.e., "the throwing of a couch or sofa from the building * * * without warning." Thus, in finding for plaintiff on the interrogatory pertaining thereto, the jury settled the issue of plaintiff's voluntary submission to a particular act. It did not, and could not, deal with the assumption—a matter of law, not fact—that plaintiff submitted to acts of negligence committed by a fellow worker or workers during the course of their shared employment. Simply put, the jury addressed itself at the trial court's direction to a particular risk allegedly created on February 2, 1971, and not to the general risk created by the interrelationship of coemployees as a matter of law under the common-law fellow-servant rule.

Second, with respect to plaintiff's contention that a question of fact for the jury was presented as to whether plaintiff, a member of an engine company, was a fellow-servant

of a member or members of the ladder company who presumably were responsible for the jettisoning of items such as a smoldering couch or sofa from a building damaged by fire, the law is settled that an employee in a situation where the fellow-servant rule is applicable, is precluded from recovery for a coemployee's negligence where both servants, though exercising different functions, were contributing directly to a common object (*Fay v De Camp*, 257 NY 407). In this instance it is undisputed that the members of the engine and ladder companies joined in a common effort toward combating, controlling and extinguishing the fire at the subject premises.

### (3) VIABILITY OF FELLOW-SERVANT RULE—
### PONIATOWSKI THEORY

The rule that the employer is not liable for injuries caused solely by the negligence of a servant was first promulgated in England in 1837 (*Priestley v Fowler*, 3 M & W [Meeson & Welsby's Exch Rep] 1, 150 Eng Rep 1030). Shortly thereafter it became recognized in the United States as well (*Murray v South Carolina R. R. Co.*, 1 McMul 385; *Crenshaw Bros. Produce Co. v Harper*, 142 Fla 27; Prosser, Torts [4th ed], § 80, p 528). One of the bases for the fellow-servant rule was that it would promote the safety of the public and all servants to make each one watchful of the conduct of others for his own protection. While such reason and others might have been appropriate to small enterprises and shops because of the close contact and acquaintance one workman had with the others, they had little validity in the industrial area where one employee might be injured by the negligence of a coemployee whom he had never seen. According to one writer, the explanation of the rule probably lay in the highly individualistic viewpoint of courts in common law, and their desire to encourage industrial undertakings by making the burden upon employers as light as possible (Dodd, Administration of Workmen's Compensation, cited in Prosser, Torts [4th ed], § 80, p 529, n 23).

Although it is true that slow progress toward imposition of liability upon an employer occurred as a result of deci-

sions in common-law cases, the impetus in that direction was greatly accelerated by the passage of workers' compensation acts. In fact it has been held that the fellow-servant rule practically disappeared with workers' compensation *(Reboni v Case Bros.,* 137 Conn 501; cf. *Fitch v Mayer,* 258 SW2d 923 [Ky]; *Kansas City Stockyards Co. of Maine v Anderson,* 199 F2d 91 [interpreting the law of Missouri]). The theory underlying workers' compensation acts was supposedly expressed in the following vivid statement attributed to Lloyd George in a campaign slogan: " '[T]he cost of the product should bear the blood of the workman.' " (See Prosser, Torts [4th ed], § 80, p 530.)

However, workers' compensation acts, at least in the earlier years, have been held not to cover the injuries of many categories of employees, such as farm laborers *(Shafer v Parke, Davis & Co.,* 192 Mich 577; *Greischar v St. Mary's Coll.,* 176 Minn 100; *Matter of Pestlin v Haxton Canning Co.,* 299 NY 477), domestic servants *(Anderson v Ueland,* 197 Minn 518), and, *inter alia,* corporate officers and working partners *(Grossman v Industrial Comm.,* 376 Ill 198; *Pederson v Pederson,* 229 Minn 460). In the absence of remedial legislation, such as workers' compensation laws, courts in many jurisdictions concluded that an employee's action against his employer was still subject, *inter alia,* to the fellow-servant rule defense *(May v Sharp,* 191 Ark 1142; *Parker v Nelson Grain & Milling Co.,* 330 Mo 95; *Richardson v American Cotton Mills,* 189 NC 653).

In this State, although it has been held that a New York City policeman *(Matter of Ryan v City of New York,* 228 NY 16), and a New York City fireman *(Matter of Krug v City of New York,* 196 App Div 226), are not entitled to benefits under the Workers' Compensation Law,[4] the absence of such coverage was not used as a basis for upholding the fellow-servant rule against a member of the city's uniformed officers. Rather, in *Poniatowski v City of New York*

---

4. Probably the primary reason for such exclusion is the fact that under other statutes and local ordinances, generous benefits are granted members of the uniformed forces including, *inter alia,* full pay during absence from duty caused by injury in performance of duty or sickness, disability retirement, etc. *(Matter of Ryan v City of New York,* 228 NY 16, 20; Administrative Code of City of New York, §§ 487a-7.1, B19-7.54 *et seq.*).

(19 AD2d 64, revd 14 NY2d 76), a majority of the Justices of this court hearing the appeal, in applying the fellow-servant rule, did not refer to the absence of workers' compensation coverage for the injured policeman. In *Poniatowski*, the plaintiff policeman was seriously injured when an unmarked police car, in which he was a "recorder" passenger, collided with another vehicle. At the time, the police car was operated by a fellow officer in pursuit of a third vehicle whose operator had ignored a stop sign. By a 3 to 2 vote, this court, relying on the fellow-servant rule and thus nonsuiting the plaintiff police officer, used the following reasoning in *Poniatowski* (19 AD2d, at pp 65-66) : (1) at common law police officers were not regarded as employees of a municipality because they performed a government function and the doctrine *respondeat superior* was inapplicable because of the city's immunity from liability; (2) in 1929 the State waived sovereign immunity for itself and municipalities by enactment of section 8 of the Court of Claims Act and section 282-g of the Highway Law[5] (now General Municipal Law, § 50-a) ; and (3) under the latter act, the police driver became an employee of the city, and since the plaintiff was required to have the same status (as a "qualified operator") as the driver under the department rules, the two men were fellow servants.

However, the Court of Appeals reversed this court's order dismissing the complaint under the fellow-servant rule and reinstated the trial court's judgment in favor of plaintiff. In rejecting the applicability of the fellow-servant doctrine, Judge FULD, writing for the majority, stated that the purpose of section 50-a of the General Municipal Law[6] was to

---

5. "Every city * * * shall be liable for the negligence of a person duly appointed * * * to operate a municipally owned vehicle [within the state] in the discharge of a statutory duty imposed upon the municipality, provided the appointee at the time of the accident or injury was acting in the discharge of his duties and within the *scope of his employment*. Every such appointee shall, for the purpose of this section, be *deemed an employee* of the municipality". (Emphasis supplied.)

6. "§ 50-a. Municipal liability for negligent operation of vehicles.

"1. Every city, town and village shall be liable for the negligence of a person duly appointed by the governing board or body of the municipality, or by any board, body, commission or other officer thereof, to operate a municipally owned

impose liability upon the city for the negligent operation of vehicles by police officers and other municipal officers and thereby overcome the hardship visited upon those who, injured by such negligence, would otherwise be without remedy. According to the majority there was no reason for not extending the relief afforded private persons under section 50-a to the police driver's fellow officers as well, since the Legislature had not provided for their exclusion from the provisions of section 50-a.

Of particular significance with respect to the case at bar is the strong criticism of the fellow-servant rule found in Judge FULD's majority opinion in *Poniatowski (supra,* p 81) : "The inherent injustice of a rule which denies a person, free of fault, the right to recover for injuries sustained through the negligence of another over whose conduct he has no control merely because of the fortuitous circumstance that the other is a fellow officer is manifest. Dean Prosser has characterized the fellow-servant rule as 'wicked' (Prosser, Torts [2d ed., 1955], p. 383), and one court has described it as resulting in 'gross injustice' and as 'callous to human rights'. *(Crenshaw Bros. Produce Co.* v. *Harper,* 142 Fla. 27, 47.) This may well suggest the desirability

---

vehicle within the state in the discharge of a statutory duty imposed upon the municipality, provided the appointee at the time of the accident or injury was acting in the discharge of his duties and within the scope of his employment. Every such appointee shall, for the purpose of this section, be deemed an employee of the municipality, notwithstanding the vehicle was being operated in the discharge of a public duty for the benefit of all citizens of the community and the municipality derived no special benefit in its corporate capacity."

Section 50-b of the General Municipal Law, pertinently provides: "Every county, city, town, village and other subdivision of government, notwithstanding any inconsistent provisions of law, general, special or local or any limitation contained in the provision of any city charter, shall be liable and shall assume the liability for the negligence of, and shall save harmless, a person duly appointed by the governing board or body of the municipality * * * in the operation of a municipally owned vehicle or other facility of transportation within the state in the discharge of a statutory duty imposed upon such person or municipality, provided the appointee at the time of the accident or injury was acting in the discharge of his duties and within the scope of his employment. Every such appointee shall, for the purpose of this section, be deemed an employee of the municipality, notwithstanding the vehicle or other facility of transportation was being operated in the discharge of a public duty for the benefit of all citizens of the community and the municipality derived no special benefit in its corporate capacity." (See *Poniatowski v City of New York,* 14 NY2d 76, 80.)

of abolishing the rule but we leave decision of that question to the future."

As is evident from both the majority and dissenting[7] opinions of the Court of Appeals in *Poniatowski*, all seven members of this State's highest tribunal had severe reservations about the viability of the fellow-servant rule in this era. However, since the majority believed that the rule was not applicable in that case because of the provisions of section 50-a of the General Municipal Law, it left for the future the decision as to whether the rule should be abolished. We strongly believe that such "future" has arrived in the case at bar.

In our opinion this Bench has three options, (1) it may determine that the fellow-servant rule is not applicable under an exception to the rule and thus sustain plaintiff's verdict; or (2) it may apply the rule and thus nonsuit the plaintiff; or (3) it may hold that the fellow-servant rule is no longer viable and thus affirm the order and sustain plaintiff's verdict.

With respect to the first two options, it has been stated that because of the great injustice stemming from the application of the fellow-servant rule, courts have been astute to engraft upon it so many modifications that little is left of its original import (53 Am Jur 2d, Master and Servant, § 295). It has also been noted that courts have carved out so many exceptions to the applicability of the rule that many have come to be considered as part of the original rule *(Crenshaw Bros. Produce Co. v Harper*, 142 Fla 27, 47, *supra)*. Amongst the multitudinous number of exceptions to the rule are the nondelegable duty to furnish a safe place to work, the duty to instruct and to warn, the "vice-principal rule", the "superior servant rule", the "different department rule", the "dangerous agency rule", ad infinitum.

In our opinion it is both illogical and self-defeating to

---

7. In a dissenting opinion by Judge VAN VOORHIS, in which Judge DYE concurred, the former stated, *inter alia* (p 82) : *"The fellow-servant rule is antiquated and should, perhaps, be abolished,* but unless it is eliminated I find no escape from the decision [of] the Appellate Division in applying it to the facts of this case."

continue a practice of engrafting exception after exception upon a flawed rule of law, which was founded not on natural justice but on an absurd and disingenuous public policy, and which has been universally discredited almost from its inception. Such action might well be compared to the engrafting of roses upon a large weed in the vain hope that the latter will no longer constitute both a threat to beneficial growth in the garden and an eyesore to the landscape. Creating exceptions to the rule does not destroy its lamented and unwanted existence, but instead leaves it readily available for judicial decisions shocking to society's sense of justice.

With respect to the rule itself, the theory upon which it is based, i.e., that public policy requires that servants, injured as a result of the negligence of a coservant, should have no remedy against their masters, because the absence of any remedy will make them more careful of their own safety than they would otherwise be, not only is untenable but is fallacious. Unlike the relation of the master with a third person which is one of arm's length, the servant is obligated to the former under a bond of fidelity and loyalty. Under the fellow-servant rule the servant, in addition, must be endowed with a prescience and ultra sensory perception in order to forewarn him of the careless propensities of his working counterparts. "[I]t is indeed strange that we should go on holding that the master is liable to every one else in the world for the negligent acts of the employee whom he selects, while acting within the scope of his employment, except to the fellow servant or employee, who is usually more apt to be injured than any member of the general public, and who has usually, by the master's orders, been subjected to the peril of such negligence on the part of his fellow servant, in the selection of which fellow servant the injured servant had no voice whatever. Such a doctrine shocks our sense of justice. *The general rule of respondeat superior should not any longer contain an exception which is so callous to human rights.*" (*Crenshaw Bros. Produce Co. v Harper,* 142 Fla 27, 47, *supra;* emphasis supplied.)

Accordingly, I conclude that the fellow-servant rule is

no longer viable in this State and is hereby abrogated (see *Jakes v City of New York*, 88 Misc 2d 355, 358).

The order of the trial court, therefore, should be affirmed insofar as appealed from, without costs or disbursements.

RABIN, MARGETT and WEINSTEIN, JJ., concur.

Order of the Supreme Court, Kings County, dated December 18, 1979, affirmed insofar as appealed from, without costs or disbursements.