09-4248-cv
Papelino v. ACP

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2010

Argued:    August 24, 2010          Decided: January 24, 2011

Docket No. 09-4248-cv

———————————

DANIEL R. PAPELINO and MICHAEL YU,

Plaintiffs-Appellants,

CARL BASILE,

Plaintiff,

v.

ALBANY COLLEGE OF PHARMACY OF UNION UNIVERSITY, JAMES GOZZO, individually and as President of Albany College of Pharmacy of Union University, HOWARD D. COLBY, individually and as Associate Dean for Academic Affairs, ELISABETH VINES, individually and as Faculty Advisor to the Student Honor Committee, and THOMAS DALTON, individually and as Chairperson of the Appellate Board,

Defendants-Appellees.[*]

———————————

Before:   WINTER, CABRANES, and CHIN, Circuit Judges.

Appeal from a final judgment of the United States District Court for the Northern District of New York (Mordue, Chief Judge) dismissing plaintiffs-appellants' sexual harassment

_____

[*]     The Clerk of Court is directed to amend the official caption in accordance with this Opinion.

and retaliation claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and their breach of contract and tort claims under New York law.

AFFIRMED in part, REVERSED in part, and REMANDED.

ALAN J. PIERCE, Hancock & Estabrook, LLP, Syracuse, NY, for Plaintiffs-Appellants.

GERALD H. KATZMAN, General Counsel, Albany College of Pharmacy, Albany, NY, for Defendants-Appellees.

CHIN, Circuit Judge:

In this case, plaintiff-appellant Daniel Papelino alleges that he was sexually harassed by a professor when he was enrolled as a student at the defendant-appellee Albany College of Pharmacy (the "College").  He complained to the Associate Dean of Student Affairs.  Shortly thereafter, the College accused Papelino and his two roommates, plaintiff-appellant Michael Yu and plaintiff Carl Basile, of cheating on exams.  All three were disciplined, and Papelino and Basile were expelled.

The three students successfully brought an Article 78 proceeding in state court to challenge the College's decisions. The Appellate Division, Third Department, held that the College's determination that the students had cheated was "arbitrary and capricious" and lacked a "rational basis."

Papelino, Basile, and Yu brought this case asserting

sexual harassment and retaliation claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), and breach of contract and tort claims under New York common law.  In a decision dated February 5, 2003, the district court (Norman A. Mordue, Chief Judge), dismissed all but two of plaintiffs' claims.  In a memorandum decision dated March 28, 2005, the district court granted plaintiffs leave to reinstate certain claims but denied leave to reinstate four claims.  And in a memorandum decision dated September 11, 2009, the district court granted summary judgment dismissing all plaintiffs' remaining claims.  Final judgment was entered the same day.  This appeal followed.

We affirm in part and reverse in part.  We conclude that while the district court properly dismissed certain claims, plaintiffs demonstrated the existence of genuine issues of material fact for trial with respect to their claims for sexual harassment, retaliation, breach of contract, and negligent supervision.  Accordingly, we remand for further proceedings.

BACKGROUND

A.   The Facts[1]

---

[1]    This is an appeal from the district court's grant of defendants' motions to dismiss and for summary judgment and the district court's denial of plaintiffs' motion for leave to

- 3 -

In 1997, Papelino, Yu, and Basile were pharmacy students at the College. They were roommates, study partners, and friends. All three were enrolled in a year-long Medicinal Chemistry course taught by Professor Deanne Nowak.

In the fall of 1997, Nowak began to flirt with Papelino in and out of class. She would wink and smile at him. She sat on the edge of his desk during one class, and gave him excessive praise for his work.

In October 1997, after the first Medicinal Chemistry exam, many students, including Papelino, petitioned Nowak for additional points. When Papelino went to Nowak's office to pick up his exam, she informed him that she had awarded him extra points, and told him, in what Papelino described as a voice "laced with sexual innuendo": "[N]ot everyone got extra points, they truly have to earn them. You know what I mean, don't you Dan?"

In January 1998, Papelino again visited Nowak's office,

---

reinstate certain claims. Accordingly, as to the claims dismissed on motion to dismiss, we assume as true all the material allegations of the amended complaint and proposed second amended complaint, see Pena v. DePrisco, 432 F.3d 98, 107 (2d Cir. 2005), and, as to the claims dismissed on summary judgment, we construe the evidence in the light most favorable to plaintiffs. Colavito v. N.Y. Organ Donor Network, Inc., 438 F.3d 214, 217 (2d Cir. 2006). In both instances, we draw all reasonable inferences and resolve all conflicts and ambiguities in favor of plaintiffs. Id.; Pena, 432 F.3d at 107.

this time to discuss a class project.  Nowak stated in a flirtatious manner:  "I can really appreciate a man who is good with his hands, if you know what I mean."  As Papelino tried to leave, she stated:  "You know I am always here for you handsome."

A month later, in February 1998, Papelino visited Nowak's office a third time, to ask a question about class material.  Nowak invited Papelino to sit down.  As Papelino began to ask his question, Nowak stood up, and then bent down in front of him so that her backside was in Papelino's face.  As Nowak looked over some papers on the floor, she directed Papelino to pick up a book from the shelf above her.  When Papelino moved to pick up the book, Nowak stood up and Papelino "felt her hand rub against [his] crotch."  Papelino asked:  "What was that for[?]"  Nowak responded, with a "grin on her face":  "It's an accident," and then, "Do you know how lonely I've been lately?"  When Papelino asked why she was telling him that, Nowak replied:  "I

thought you might be interested in knowing that."  Papelino told her that she had him "all wrong," and left the office.

In March 1998, Nowak asked Papelino to stay after class.  Nowak invited Papelino to attend a college-sponsored party with her so that she could "teach [him] to dance."  When Papelino declined, Nowak said:  "So that means you are going to make me go

alone?"

Finally, on April 6, 1998, Papelino and his classmates attended a "poster session" in the school gymnasium, where groups of students presented posters and pamphlets of information about different prescription drugs. Nowak approached Papelino and asked him to go out with her the next day to celebrate her birthday. According to Papelino, the following ensued:

> I told her, "I thought I made it clear that I am not interested in any kind of personal relationship." Nowak said, "C'mon, what are you worried about?" I said, "I have a girlfriend, you are married, and I'm not interested!" Nowak then persisted and stated: "I wouldn't be too concerned about my husband, he's in Ohio." I told her that if she couldn't take "NO" for an answer, I think Dean White might be interested in hearing about this. Nowak's attitude changed and sternly told me that doing so would be a "big mistake." She then said, "Well, if you think it's necessary, go ahead and try it and see what happens!"

Papelino immediately reported Nowak's sexual advances to the College's Associate Dean for Student Affairs, Albert White. As defendants conceded below, Papelino spoke to White "on or about April 6, 1998" about Nowak, when he sought advice about Nowak's "sexual overtures." According to Papelino, White reported back to him in late April 1998, stating that he had "spoken to Nowak" and that the matter had been "taken care of." Dean White testified at his deposition, however, that he "never

spoke to anybody" about the situation, nor did he "go to any member of the administration . . . 'cause [he] didn't want to let it out." Around that time, Papelino noticed a change in Nowak's behavior, as she started to act cold and unfriendly toward him.

On or about May 6, 1998, Nowak told Elisabeth Vines, the Faculty Advisor to the Student Honor Code Committee, that she believed Papelino and Basile had cheated in her Medicinal Chemistry course, as well as in a Pharmacology course taught by Nowak's roommate, Professor Diane Sylvester. Nowak testified at her deposition that she first decided to look into whether Papelino and Basile had been cheating in early December 1997 when she received an "anonymous note" slipped under the door to her office.[2] She thereafter told Sylvester that she thought Papelino and Basile "were cheating" and she asked Sylvester to check her exams. At some point she approached other instructors as well, including Professor Jeffrey Voight, who had Papelino and Basile in their classes, asking them to look at their exams to see whether the students had cheated.

On May 8, 1998, just two days after Nowak spoke to Vines, Papelino and Basile received e-mail notices that they had been accused of violating the College Honor Code. Over the next

---

[2]     At her deposition, Nowak testified that she "kept" the note, although she could not recall where, and that she was later unable to find it.

week, Yu was also charged with cheating, and the number of courses in which Papelino and Basile were accused of cheating grew to nine.

A hearing was held on May 20, 1998.[3]  In support of the charges, Nowak presented evidence, which consisted primarily of "statistical" charts that she had prepared based on her review of exams taken by Papelino, Basile, and Yu in various courses. Papelino, Basile, and Yu countered with (1) the lack of evidence of the means by which the three might have managed to cheat; (2) the fact that the three studied together, and therefore had similar knowledge bases; and (3) the lack of validity of the "statistical" evidence.  During the hearing, Nowak leaned over while showing a document to plaintiffs, "whereby her shirt fell forward and plaintiffs were exposed to her bare breasts."  The Student Honor Code Committee found Papelino guilty of cheating in three classes, Basile guilty of cheating in six classes, and Yu guilty of cheating in one class.

The three students appealed the decision to the College Honor Code Appellate Board, but the Board declined to hear the appeal.  The students received failing grades in the classes in

_____

[3]  Prior to the hearing, there was a meeting of the professors who were going to be presenting the case at the hearing.  Nowak chaired or ran the meeting and "summarized the data that everyone had given [her]."

which they were found to have cheated.  In August 1998, Papelino and Basile were expelled, and Yu was permitted to retake the one class.

In September 1998, plaintiffs commenced an Article 78 proceeding in New York State Supreme Court, Albany County.  They sought to annul the Honor Code Committee decision.  The Supreme Court dismissed their petition, but on appeal, the Third Department reversed and held that the College's determinations to expel Basile and Papelino and to award Yu a failing grade were "arbitrary and capricious" and lacked a "rational basis."  Basile v. Albany Coll. of Pharmacy of Union Univ., 279 A.D.2d 770, 771 (3d Dep't), leave to appeal denied, 96 N.Y.2d 708 (2001). Specifically, the Third Department concluded that the Honor Code Committee's determinations were based "solely" on a "statistical compilation" that was based upon "false assumptions" and did not provide "a rational basis to conclude that petitioners cheated." 279 A.D.2d at 771.  The Third Department also held that as "the same statistical methodology" was used to evaluate the charges, there was "no rational explanation" for why Basile was found guilty of cheating in six out of nine courses, Papelino in three out of nine courses, and Yu in one out of seven courses.  Id. at 772.  Finally, the Third Department held that the allegations of cheating were based on "either hearsay anonymous notes or . . .

sheer speculation," and that "it was irrational of the Committee to determine that it could rely solely on the inference of cheating raised by the statistical compilation, particularly when faced with proof that petitioners took these examinations in separate rooms and under the watchful eye of a proctor, who discerned no evidence of cheating."  Id.

After the Article 78 proceedings, the College faculty voted in May 2001 to award Papelino and Basile their diplomas. Yu had already received his diploma after having retaken the one course.  According to the President of the College, Papelino's diploma was issued "without notation or qualification," and it was back-dated to Papelino's originally-planned graduation date. On May 1, 2001, the College sent Papelino's transcripts to the Division of Professional Licensing Services in New York -- without any reference to the Honor Code proceedings or the Article 78 decision.

On July 9, 2001, after the commencement of this action below, Papelino requested that the College certify his degree to Florida's pharmacy licensing authorities.  The College's attorney responded to Papelino as follows:

> [The College] proposes to complete the certification and attach thereto the decisions of Justice Malone and the Appellate Division, and send the same to Florida.  A further caveat needs to be added as to the pendency of this lawsuit, which upon

> resolution may effect [sic] the award of the degree. I would like to discuss with you appropriate language to the effect that: "It may be determined in a pending action commenced by Mr. Papelino that the charges were true, which may result in the revocation of Mr. Papelino's degree."

B. Proceedings Below

On or about May 8, 2001, plaintiffs commenced this action in the Supreme Court of the State of New York, Oneida County. Papelino asserted claims for sexual harassment and retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and all three plaintiffs asserted claims for breach of contract, negligent and intentional infliction of emotional distress, and prima facie tort.

Defendants removed the action to the district court below on June 7, 2001. Plaintiffs filed an amended complaint in September 2001, adding, inter alia, negligent supervision claims and a claim that the College's refusal to provide an unqualified certification of Papelino's degree to Florida constituted unlawful retaliation for filing this lawsuit.

Defendants moved to dismiss. In a memorandum decision and order dated February 5, 2003, the district court dismissed plaintiffs' breach of contract, tort, and hostile educational environment sexual harassment claims, but permitted Papelino to proceed with his claims for quid pro quo sexual harassment and

- 11 -

retaliation.

Plaintiffs filed a motion for leave to file a second amended complaint. In a memorandum decision and order dated March 28, 2005, the district court granted plaintiffs leave to file a second amended complaint reinstating certain claims, but denied plaintiffs leave to reinstate four claims: prima facie tort, negligent infliction of emotional distress, intentional infliction of emotional distress, and hostile environment sexual harassment.

Following discovery, defendants moved for summary judgment. On September 11, 2009, the district court granted summary judgment to defendants on all claims, Papelino v. Albany College of Pharmacy of Union Univ., No. 01 Civ. 909 (NAM), 2009 WL 2957789 (N.D.N.Y. Sept. 11, 2009), and entered final judgment dismissing the second amended complaint in its entirety. This appeal followed.

DISCUSSION

A. Standard of Review

We review de novo a district court's grant of summary judgment, reversing where there are genuine issues of material fact. See Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006). Similarly, we review de novo a district court's grant of a motion to dismiss under Rule 12(b)(6). See

Simmons v. Roundup Funding, LLC, 622 F.3d 93, 95 (2d Cir. 2010). While we generally review a district court's denial of a motion for leave to amend a pleading for abuse of discretion, where the denial is based on rulings of law, our review is de novo. See Spiegel v. Schulmann, 604 F.3d 72, 78 (2d Cir. 2010); Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 242 (2d Cir. 2007).

B.    The Merits

We address in turn the claims for sexual harassment, retaliation, breach of contract, and negligent supervision, and then we discuss the remaining claims.

1.    Sexual Harassment

a.    Applicable Law

Title IX provides a remedy to a student who is subjected to sexual harassment by a teacher or professor at an educational institution receiving federal funds. Hayut v. State Univ. of N.Y., 352 F.3d 733, 749-50 (2d Cir. 2003); see also Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 280 (1998). For an educational facility to be liable, however, the plaintiff must establish that a school official with "authority to address the alleged discrimination and to institute corrective measures" had "actual knowledge" of the discrimination and failed to adequately respond. Gebser, 524 U.S. at 290. A school fails to adequately respond if it provides no response or if it provides a

- 13 -

response that "amount[s] to deliberate indifference to discrimination." Id. The school's response to sex discrimination must be "clearly unreasonable" in light of known circumstances. Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648 (1999).

In other respects, a Title IX sex discrimination claim requires the same kind of proof required in a Title VII sex discrimination claim. See Torres v. Pisano, 116 F.3d 625, 630 n.3 (2d Cir. 1997) ("We have held that Title VII principles apply in interpreting Title IX."). Therefore, as under Title VII, a quid pro quo sexual harassment claim under Title IX requires proof of three elements: (1) the rejection of sexual advances; (2) a tangible school-related (as opposed to employment) consequence; and (3) a causal connection between the two. See Karibian v. Columbia Univ., 14 F.3d 773, 778 (2d Cir. 1994). In the education context, a tangible consequence occurs when "some benefit or adverse action," such as a change in a grade, is made to depend upon providing sexual favors to someone in authority. Wills v. Brown Univ., 184 F.3d 20, 25 (1st Cir. 1999).

Similarly, a Title IX hostile education environment claim is "governed by traditional Title VII 'hostile environment' jurisprudence." Hayut, 352 F.3d at 744. A Title IX plaintiff must show that he subjectively perceived the environment to be hostile or abusive and that the environment objectively was

- 14 -

hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment. Id. at 745; see also Davis, 526 U.S. at 633 (for Title IX sexual harassment claim, plaintiffs must show conduct "that [was] so severe, pervasive, and objectively offensive that it effectively bar[red] . . . access to an educational opportunity or benefit").

        b.   Application

We discuss first the quid pro quo claim and then the hostile environment claim.

        (i)  Quid Pro Quo Harassment

We conclude that genuine issues of material fact exists with respect to Papelino's quid pro quo claim. The district court concluded that Papelino had failed to present sufficient evidence that the College had "actual knowledge" of the serious nature of Nowak's sexual overtures towards him or that the College acted with deliberate indifference. We disagree.

There is sufficient evidence in the record to permit a reasonable jury to find that the College had actual notice of Nowak's sexual advances: Papelino complained to Dean White about Nowak's sexual advances. First, White was a high-ranking member of the College's administration who was "responsible for the

administration of the Student Code."  Second, in their amended

answer to the amended complaint, defendants admitted that

Papelino spoke to White about "sexual overtures" made by Nowak

against him.  Third, White testified at his deposition that

Papelino spoke to him on or about April 6, 1998, and told him

that Nowak was giving him "favorable marks because of actions,"

as well as "something about a blouse" and "something about

dinners or . . . going out."  Finally, Papelino asserted that he

gave White detailed information:

> I told [Dean White] that I was having
> problems with Prof. Nowak.  He asked me,
> "What kind of problems?"  I told him Prof.
> Nowak has been making passes at me.  He asked
> me, "What do you mean by that?"  I told him
> that on several occasions Nowak had asked me
> to go out with her on a personal level[.]  I
> also explained that she went so far as to
> touch me.  Dean White said, "Where did she
> touch you?"  I then explained to him the
> incident that happened on Feb. 18, 1998 and
> the several other incidents that took place.
> I told him these incidents have made me very
> uncomfortable and nervous.

Together, this evidence provides a more-than-sufficient basis for

a reasonable jury to conclude that White (and hence the College)

was on "actual notice" of Nowak's alleged behavior.

As for deliberate indifference, Papelino was required

to adduce evidence that the College or its agents "knowing[ly]

refus[ed] to take any action in response" to the behavior, such

as "investigat[ing] or put[ting] an end to the harassment,"

- 16 -

Davis, 526 U.S. at 651, 654, or "refus[ed] to take action to bring the recipient [institution] into compliance," Gebser, 524 U.S. at 290. We conclude that Papelino did so. White testified at his deposition that he "kept . . . quiet" about Papelino's complaint -- that he did not speak to Nowak or anyone else at the College about the complaint -- because he "didn't want to let it out." Although White was responsible for administering the Student Code, he did nothing to investigate Papelino's complaint. He did not follow the procedures established by ACP for processing complaints of sexual harassment. He did not "take care" of the situation as he had told Papelino he would. He failed to intervene in the Honor Code proceedings initiated by Nowak against plaintiffs. A reasonable jury could surely find "deliberate indifference" from these facts.

Finally, we also conclude that there is sufficient proof of the elements of a quid pro quo claim to entitle Papelino to a jury trial. Papelino adduces evidence that: Nowak made sexual advances toward him, he rejected them, and Nowak initiated Honor Code proceedings against him soon thereafter, falsely accusing him of cheating. The close temporal proximity between Papelino's final rejection of Nowak's advances and her initiation of proceedings combined with the apparent speciousness of the proffered proof of cheating constitute evidence of a causal

connection, especially given Nowak's warning that it would be "a big mistake" for Papelino to report her to White.

### (ii) Hostile Environment Harassment

As for the hostile environment claim, the district court dismissed the claim on grounds of timeliness. It held (correctly) that a three-year statute of limitations applied, see Torre v. Columbia Univ., No. 97 Civ. 0981 (LAP), 1998 WL 386438, at *5 (S.D.N.Y. July 10, 1998), aff'd, 189 F.3d 462 (2nd Cir. 1999); Benzo v. N.Y. State Div. of Human Rights, No. 95 Civ. 5362 (LAP), 1997 WL 37961, at *5 (S.D.N.Y. Jan. 31, 1997), aff'd, 141 F.3d 1151 (2d Cir. 1998), and determined that the claim was untimely because the last act of alleged sexual harassment occurred in April 1998, more than three years before suit was filed (on May 8, 2001). The district court concluded that the only "harassing event" alleged to have occurred within the three years prior to filing of suit was when Nowak purportedly exposed her breasts to plaintiffs at the Honor Code hearing on May 20, 1998. The district court held that this incident was not sufficiently severe to constitute actionable sexual harassment.

We reverse. First, the incident at the Honor Code hearing cannot be so easily dismissed. Nowak's alleged exposure of her breasts at the hearing cannot be viewed in isolation. In context, a jury could reasonably find that Nowak engaged in the

conduct as a final sexual taunting of Papelino and the others. See Gregory v. Daly, 243 F.3d 687, 693 (2d Cir. 2001) (to determine whether an environment is hostile or abusive, courts must look at "the totality of the circumstances rather [than] individual events in isolation"); accord Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").

Second, the record contains evidence of other incidents of hostile conduct within the three-year limitations period. For example, after plaintiffs were notified by email on May 8, 1998 of the cheating charges, Nowak spearheaded the prosecution of the charges by meeting with other professors and leading the presentation of the evidence. A reasonable jury could find that Nowak engaged in this conduct because Papelino rejected her sexual advances, and that these actions were part of a pattern of pervasive conduct that was sufficiently hostile or abusive to alter the conditions of Papelino's educational environment. While this adverse treatment was not overtly sexual in nature, in the circumstances here, a reasonable jury could find that it was "on account of sex." See Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (both sex-specific and other adverse treatment can be part of a hostile environment where the "other adverse treatment was also suffered on account of sex"). Moreover, under

- 19 -

the continuing violation doctrine, a plaintiff may bring claims for discriminatory acts that would have been barred by the statute of limitations as long as "an act contributing to that hostile environment [took] place within the statutory time period." McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002)). A reasonable jury could find that the post-May 8, 1998 conduct was part of a continuing course of conduct that began with Novak's earlier sexual advances.

## 2. Retaliation

### a. Applicable Law

"[R]etaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of [Title IX].'" Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 183 (2005) (quoting Davis, 526 U.S. at 642). As in the context of Title VII, a plaintiff claiming retaliation under Title IX must first establish a prima facie case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998). "Close temporal proximity between the plaintiff's protected activity and the . . . adverse action may in itself by sufficient to establish

the requisite causal connection."  Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the articulated reasons are pretextual.  Id. at 804-05.

Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the "knowledge" requirement is met if the legal entity was on notice. Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 113-14 (2d Cir. 2000) (Title VII context).  "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."  Id. at 116.

While the individual agents' claims of unawareness of the protected activity are relevant to the jury's determination of causality, a jury is entitled to disregard such claims if they are unreliable.  Further, while lack of knowledge on the part of particular agents who carried out the adverse action is evidence of lack of causal connection, a plaintiff may counter with evidence that the decision-maker was acting on orders or encouragement of a superior who did have the requisite knowledge.

- 21 -

See Gordon, 232 F.3d at 117 (2d Cir. 2000); Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 148 (2d Cir. 2010).  In a retaliation case, a plaintiff is only required to prove that "a retaliatory motive play[ed] a part in adverse [] actions toward [him], whether or not it was the sole cause."  Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003) (citing Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)).

b.    Application

Here, a jury could find actionable retaliation both in terms of the initiation of the Honor Code proceedings and the College's refusal to provide an unqualified certification of Papelino's degree to the State of Florida.

In terms of the initiation of the Honor Code proceedings, the district court concluded that the individuals who participated in the Honor Code Panel's decision were unaware of Papelino's complaints against Nowak, and that, therefore, they found plaintiffs guilty of cheating only because they actually believed the students were guilty.  The district court concluded, therefore, that Papelino failed to establish "knowledge" and a "causal relationship."

Construing the evidence and drawing all reasonable inferences in favor of plaintiffs, however, we conclude that triable issues of facts existed as to knowledge and causation. First, there was evidence of knowledge -- evidence that the

- 22 -

College knew that Papelino had engaged in protected activity. Papelino complained to White, and thus White was aware that Papelino was engaging in protected activity. Yet, White did nothing even after the cheating charges were lodged against Papelino. Moreover, Papelino told Nowak that he was going to report her to White, and indeed he did so. Although White testified that he never spoke to Nowak, the jury was not required to credit this testimony. There is evidence that Nowak's behavior toward Papelino changed -- she became cold and hostile toward him -- around this time, and Papelino asserted that White reported that he had spoken to Nowak. The record also includes evidence that members of the College faculty discussed Papelino's allegations of sexual harassment during and after the Honor Code appeals process. A reasonable jury could also conclude that even if the Panel members were themselves unaware that Papelino had engaged in protected activity, they were acting on Nowak's explicit encouragement, or that they acted without information that White should have imparted to them.

Second, the record contains substantial evidence of causation. A reasonable jury could find that Nowak initiated the Honor Code proceedings for retaliatory reasons rather than a good faith belief that Papelino had actually cheated. Nowak compiled and presented the evidence to the Panel, serving as the hearing's primary witness. The speciousness of the evidence presented to

the Panel, as determined by the Third Department, is further evidence of a retaliatory motive and a causal connection. A reasonable jury could also find that White should have followed up on Papelino's complaint once the cheating charges were brought against him. In any case, for Papelino to recover on his retaliation claim, he need only establish that impermissible retaliation was one motive behind the initiation of the Honor Code charges against him -- not that it was the sole reason that any of the Panel members voted to find him guilty of cheating.

See Terry, 336 F.3d at 140-41. From the evidence adduced, a reasonable jury surely could reach such a conclusion.

As for the College's refusal to provide an unqualified certification to the Florida Pharmacy Board, we also find an issue of fact as to impermissible retaliatory motive. Though the College claims that it refused to give an unqualified certification to the State of Florida because it still harbored doubts about Papelino's academic integrity, the validity of this explanation is undermined by the College's decision to provide an unqualified certification to the State of New York two months prior. The only circumstance that changed in the interim was plaintiffs' filing of this litigation. Further, the College's letter to Papelino's counsel as much as admits that the "pendency of this lawsuit" was the reason why the College was no longer

willing to provide an unqualified certification. At a minimum, there are issues of fact here.

3. Breach of Contract

a. Applicable Law

Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree. Carr v. St. John's Univ., 17 A.D.2d 632, 633 (2d Dep't), aff'd, 12 N.Y.2d 802 (1962); accord Clarke v. Trs. of Columbia Univ., No. 95 Civ. 10627 (PKL), 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996). The terms of the implied contract are "contained in the university's bulletins, circulars and regulations made available to the student." Vought v. Teachers Coll., Columbia Univ., 127 A.D.2d 654, 654 (2d Dep't 1987). Implicit in the contract is the requirement that the institution "act in good faith in its dealing with its students." Olsson v. Bd. of Higher Educ., 49 N.Y.2d 408, 413-14 (1980). At the same time, "the student must fulfill [his] end of the bargain by satisfying the university's academic requirements and complying with its procedures." Gally v. Columbia Univ., 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998).

As the district court noted below, New York law does not recognize a claim for "educational malpractice," Introna v.

- 25 -

Huntington Learning Ctrs., Inc., 78 A.D.3d 896, 896 (2d Dep't 2010), and a student may not seek to avoid this rule by couching such a claim as a breach of contract claim. Gally, 22 F. Supp. 2d at 207. Indeed, courts must show the "utmost restraint" in intervening in controversies involving a student's academic qualifications, for "the decisions surrounding the issuance of [academic] credentials [must] be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis." Olsson, 49 N.Y.2d at 413.

b.    Application

This is one of those rare education cases where it is appropriate for a court to intervene. Indeed, the Third Department has already done so, setting aside the College's determination that plaintiffs had cheated. Largely for the reasons set forth above, we conclude that genuine issues exist for trial with respect to whether the College breached its implied duty of good faith by, inter alia, failing to investigate Papelino's complaint of sexual harassment, mishandling the Honor Code proceedings after Nowak accused plaintiffs of cheating, and denying (at least initially) Papelino and Basile a diploma and failing Yu in a course. Accordingly, we conclude that the district court erred in granting summary judgment dismissing plaintiffs' breach of contract claim.

4.    Negligent Supervision

a.    Applicable Law

Under New York law, a plaintiff asserting a claim for negligent supervision must prove:  (1) the tortfeasor and defendant were in an employee-employer relationship; (2) the employer knew or should have known of the employee's propensity for the tortious conduct; and (3) the tort was committed on the employer's premises or with the employer's chattels.  Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004).

When describing an employee's "tortious propensities," case law often turns to the concept of "unfitness."  See, e.g., Loughry v. Lincoln First Bank, N.A., 67 N.Y.2d 369, 378 (1986); Malone v. Hathaway, 64 N.Y. 5, 10 (1876); Steinborn v. Himmel, 9 A.D.3d 531, 533 (3d Dep't 2004).  An employer will be liable to an injured party for an employee's tort when the employer knew or had reason to know that the employee was unfit for the job.  An "unfit" employee may take a variety of shapes.  Commonly, she is alleged to be habitually violent, Fernandez v. Rustic Inn, Inc., 60 A.D.3d 893, 897 (2d Dep't 2009), or careless, Lawrence v. City of N.Y., 82 A.D.2d 485, 503 (2d Dep't 1981), or drunk, Cygan v. City of N.Y., 165 A.D.2d 58, 68 (1st Dep't 1991).  The common theme, though, is that for whatever reason -- whether something about an employee's essential nature or something less permanent and more situational -- she is unsuited for the task that she has undertaken to perform.

- 27 -

b. Application

Here, plaintiff's negligent supervision claim asserts that the College is liable for Nowak's tortious conduct in two respects: the sexual harassment and her misuse of the Honor Code proceedings.

As to the sexual harassment, we agree with the district court that the record contained insufficient evidence to permit a jury to find that the College knew or had reason to know that Nowak would sexually harass a student. Although, as we have held, the record contains evidence of the College's actual notice of Nowak's purported sexual conduct, that notice arose after the conduct had occurred. There is nothing in the record to suggest that the College knew, or should have known, that Nowak was unfit to teach because she had a propensity for sexually harassing students.

As to the handling of the cheating charges, however, we conclude that issues of fact existed as to whether the College knew or had reason to know that Nowak would misuse the Honor Code process to engage in what plaintiffs have described as a "charade." Given Nowak's apparent conflict of interest, the College's decision to permit her to serve, in essence, as the prosecutor and star witness in the Honor Code proceedings was highly questionable. Cf. In re Estate of Palma, 40 A.D.3d 1157,

- 28 -

1158 (3d Dep't 2007) ("conflict, divided loyalty, self-interest, and hostility" rendered petitioner "unfit" to serve as a fiduciary).  The College had a duty to plaintiffs to administer the Honor Code proceedings in a fair and impartial manner.  A reasonable jury could conclude, on this record, that the College was negligent in its handling of the proceedings by permitting an unfit person to lead the disciplinary process.

Accordingly, we reverse the dismissal of the negligent supervision claim to the extent the claim is based on the filing and prosecution of the cheating charges.

5.   Remaining Claims

We affirm the district court's dismissal of the remaining claims substantially for the reasons articulated by the district court.

CONCLUSION

The orders of the district court are hereby REVERSED with respect to the Title IX quid pro quo and hostile environment sexual harassment, Title IX retaliation, breach of contract, and negligent supervision claims, and AFFIRMED in all other respects. We REMAND for further proceedings.