**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 15a0322n.06

Case No. 14-2032

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KATHERINE HENDERSON, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | May 01, 2015 |
| | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| CHRYSLER GROUP, LLC, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, ROGERS, and COOK, Circuit Judges.

**SILER**, Circuit Judge. Plaintiff Katherine Henderson ("Henderson") appeals the district court's grant of summary judgment in favor of Chrysler Group LLC ("Chrysler" or the "Company"). The district court found that Henderson failed to establish a *prima facie* case of retaliation under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* The court recognized that, even if Henderson established a *prima facie* case under the ADA, she failed to show that Chrysler's reasons not to rehire her—performance issues—were a pretext for disability discrimination. For the following reasons, we **AFFIRM**.

**FACTUAL BACKGROUND**

Henderson worked for Chrysler in various positions from 1986 until she was laid off in August 2011. She served in her final position at Chrysler as a Talent Acquisition ("TA") Placement Manager within the TA department from May 2007 until June 2011 when the position was outsourced. As a TA Placement Manager, Henderson recruited and placed candidates in open positions within various departments (known as customers) at Chrysler.

Following Chrysler's bankruptcy in 2009, the demand for hiring increased significantly. In 2010, Chrysler decided to outsource the TA department to a company named "The Right Thing." All TA Placement Managers, including Henderson, were notified that their positions would be outsourced by June 2011. Henderson admitted that it was ultimately each employee's responsibility to find another position at Chrysler, which planned to redeploy every employee who desired to be redeployed from the TA department to another department. Henderson also admitted that her job was not outsourced due to any leave (under the FMLA or otherwise) that she had taken or any disability that she may have had.

Lisa Wicker ("Wicker") was the executive responsible for the TA department. From 2009 through 2011, Wicker oversaw the TA department and served as Henderson's boss. Henderson initially reported directly to Wicker until Wicker hired senior management—individuals more senior than Henderson—within the TA department to assist with the post-bankruptcy increased hiring needs. Wicker first hired Michelle Cook to whom Henderson reported directly. Subsequently, Joe Delikat ("Delikat"), who was a colleague of Henderson's for a three-month period in 2010, became a senior manager and then became Henderson's immediate supervisor in March 2011. Before Wicker hired senior management for the TA

department, Henderson also reported to Kathryn Lee ("Lee"), a member of senior management in the human resources ("HR") department.

During this two-year period, Wicker received numerous complaints about Henderson's performance. Lee approached Wicker to discuss her concerns regarding Henderson's performance. Among Lee's concerns were that Henderson missed work, worked from home when she was not authorized to do so, and was not customer-focused. Henderson's inattentiveness was confirmed by one of her customers, Rich Dubrava ("Dubrava"). Dubrava was unhappy with Henderson's performance because she was not responsive to his requests. In the fall of 2010, Wicker informed Henderson that she, along with Henderson's supervisors and customers, was disappointed with Henderson's work performance. Wicker told Henderson about various tasks that Henderson let slip through the cracks that either Wicker or Henderson's teammates had to address.

Wicker prepared Henderson's performance reviews in 2010 and 2011, which were for the 2009 and 2010 calendar years, respectively. Henderson's performance review for the 2010 calendar year, conducted in January 2011, was sub-par. Henderson's performance review for the 2010 calendar year revealed the following deficiencies:

> Her "work in 2010 was inconsistent in delivery, timeliness as well as commitment."

> "Her customer's [sic] concerns were numerous due to lack of her follow-up and commitment to get tasks accomplished when expected."

> Her "overall performance lacked the appropriate follow-up, customer focus and delivery timeliness expected. Some of the work that [Henderson] was to complete, was done so in spite of her in-actions [sic]. For example, on several occasions either the Director of TA responded to emails on her behalf or one of her team mates performed worked [sic] that she was required to do because she had not responded to the customer or the needs of the department."

Several months after Henderson's performance review for 2010 and after Delikat became her supervisor in March 2011, Delikat began receiving feedback from Henderson's customers about her performance. Delikat testified that at least three of Henderson's customers—Dubrava, Lisa Giese and Kristi Mandoky—complained about her performance. The primary concern raised by the customers was that Henderson was nonresponsive and inattentive. Her customers were unhappy with the amount of time it took her to acknowledge and to respond to their requests.

Delikat testified that, from March through early May 2011, he was concerned with Henderson's sporadic attendance at work. It was Delikat's belief that her sporadic attendance was due to "absenteeism," which was later recorded as vacation time. He specifically testified that he would not have approved the number of days that Henderson took off had she asked for vacation days in advance because the TA department was very busy during that period and had a very heavy workload. Delikat and Wicker exchanged emails about their concern that Henderson was frequently working from home despite the fact that Chrysler did not have a policy in place to permit individuals in Henderson's position to work from home. The testimony from Henderson's supervisors and customers established that they felt it was important for TA Placement Managers to be at work and available to assist with recruiting and placing candidates in open positions at Chrysler.

During the first week of May 2011, Henderson's daughter became ill and could not attend school for the week. On Tuesday morning, she took her daughter to the doctor and then worked from home in the afternoon. The following day, Henderson stayed with her daughter and again worked from home. On Friday, Henderson made the decision to take her daughter back to the doctor. Later that day, Henderson went into the office.

On or before May 10, 2011, Wicker, Delikat and a representative from the HR department decided to place Henderson on a performance improvement plan ("PIP"). However, Henderson was never placed on the PIP because the day after they made the decision to do so, she announced that she would be taking an extended leave.

Henderson had an appointment with her rheumatologist on May 10, 2011—the same day that Chrysler decided to place her on a PIP. That evening, Henderson called Delikat to inform him that her physician strongly advised that she begin biologic medical treatment for her rheumatoid arthritis. She told Delikat that she expected to return to work in about a month. On May 11, 2011, Henderson met with Nora Towne ("Towne") to transition her work to Towne in her absence. That afternoon, Henderson sent an email to several of her customers, copying Delikat and Wicker, among others, stating that, effective immediately, she would "be out for an extended period" and that Towne would manage her responsibilities while she was out on leave.

On June 1, 2011, Henderson's position was eliminated because the TA department was outsourced. Henderson knew that her position would be outsourced to The Right Thing and that it was her responsibility to look for another position at Chrysler. However, between the time Henderson began her leave in mid-May 2011 and her return in late-June 2011, she did not speak with anyone about other job opportunities or apply for any positions at Chrysler. Upon her return to work on June 28, 2011, she was placed on paid administrative leave effective June 29, 2011, since her position had been outsourced.[1] Henderson was not surprised that her position had been outsourced upon her return in late June. In August 2011, she was laid off because she had not located another job at Chrysler.

---

[1] That same day, Henderson requested and received paperwork for FMLA leave, but she did not return the forms to Chrysler.

It was not until mid-October 2011 that Henderson applied for her first job posting through chryslercareers.com. Thereafter, she applied for between 100 and 200 positions through chryslercareers.com. The Right Thing screened applications to ensure the applicant had the minimum qualifications. A bachelor's degree was almost always a minimum requirement for the job postings to which Henderson applied; however, Henderson did not complete her bachelor's degree until December 2011.

In the fall of 2011, Henderson applied for a "Model Planner" position at Chrysler. The Model Planner position was part of the Engineering Research and Development ("ER&D") department. Henderson participated in an initial screening interview, which was conducted telephonically by Talent Acquisition Manager Tom Riley ("Riley") with The Right Thing. After the phone interview phase, the manager of the ER&D department, Michael St. Pierre ("St. Pierre"), determined who would receive an in-person interview. St. Pierre and his boss at the time, Chrissy Siko, interviewed Henderson in person on December 5, 2011.

Although Henderson's face-to-face interview score was one of the lowest among the candidates interviewed, St. Pierre decided to place Henderson in the "offer pool" and began the process of extending her an offer. Once St. Pierre decided to place a candidate in the offer pool, the process was turned over to Greg Franson ("Franson")—the HR contact for the ER&D department. Riley informed Henderson that she was in the offer pool. Significantly, Henderson knew that being placed in the offer pool was not the final decision regarding receipt of the job and that after being placed in the offer pool any official offer would come from HR.

When St. Pierre notified Franson that he placed Henderson in the offer pool, Franson began his due diligence. Franson was told by Delikat that Henderson had "behavioral issues, things like attendance, inconsistent performance related to that, and that, you know, he felt like

candidates were lost or not hired because of those performance issues." Franson relayed to St. Pierre what he learned from Delikat, and he also recommended to St. Pierre that he not proceed with the offer. St. Pierre testified that the Model Planner position is "very high stress and you have to be there all of the time" and that "[i]f I had brought her on she wouldn't survive." St. Pierre further testified that after receiving the information from Franson, he decided not to extend an offer to Henderson for the Model Planner position.

St. Pierre immediately emailed Riley after speaking with Franson, and St. Pierre stated in the December 16 email that "[he] just got off the phone with Greg Franson and he has done some background checks on Kathy Henderson and found that she has had some behavior issues as well as consistently wanting to work from home and having her assignments not get done when needed." Prior to notifying Henderson of St. Pierre's decision, Riley also spoke with Franson. Consistent with what Franson conveyed to St. Pierre, Franson told Riley that there was negative information in Henderson's HR file. Henderson was notified of her removal from the offer pool, and she did not receive an offer for the Model Planner position.

## PROCEDURAL HISTORY

After receiving a right to sue letter from the Equal Employment Opportunity Commission, Henderson filed a complaint against Chrysler. Henderson alleged violations of: (1) the FMLA (Count I); (2) the Michigan Persons with Disability Civil Rights Act ("PWDCRA") (Count II); (3) the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") (Count III); (4) the Age Discrimination in Employment Act ("ADEA") (Count IV); and (5) the ADA (Count V).

The district court granted Chrysler's motion for summary judgment.[2] It found that Henderson could not establish a *prima facie* case of FMLA retaliation (Count I). Specifically, it found that Henderson failed to show that St. Pierre had knowledge of her medical leave (protected conduct) or that there was a causal connection between the protected conduct and the alleged adverse employment action (failure to receive the position in December 2011). The court analyzed Henderson's ADA and PWDCRA claims together (Counts II and V) and also found that Henderson failed to establish a *prima facie* case on her discrimination claims. The court then noted that, even assuming Henderson established a *prima facie* case of disability discrimination, Chrysler established a legitimate reason for its decision not to rehire her—her "performance was poor, she had 'behavioral issues' with attendance and often worked from home." The court concluded that Henderson could not show that Chrysler's offered reasons were a pretext.

## DISCUSSION

"We review a grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

## I.

"The Family and Medical Leave Act declares it unlawful for 'any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under this subchapter.'" *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 450 (6th Cir. 2005) (quoting 29 U.S.C. § 2615(a)(1)). There are two theories of recovery under the FMLA—

---

[2] The district court found that Henderson abandoned her age discrimination claims under the ADEA and the ELCRA (Counts III and IV) because she failed to respond to Chrysler's arguments either in her briefing or at oral argument. Henderson does not appeal the district court's findings with respect to her age discrimination claims.

the "entitlement" or "interference" theory arising from 29 U.S.C. § 2615(a)(1) and the "retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2). *See Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555 (6th Cir. 2006). On appeal, Henderson only challenges the court's ruling with respect to her FMLA retaliation claim.

When a plaintiff tries to prove retaliation under the FMLA through circumstantial evidence, we apply the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006). To establish a *prima facie* case of FMLA retaliation, Henderson "must demonstrate that: (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian*, 454 F.3d at 556 (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)). If Henderson establishes a *prima facie* case, then the burden shifts to Chrysler to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). If Chrysler makes that proffer, then the burden shifts back to Henderson, who must present evidence that the proffered reason is merely a pretext for discrimination. *Id.*

On appeal, Henderson asserts that the district court erred in finding that she failed to establish a *prima facie* case of FMLA retaliation. Specifically, she argues that the district court held that she failed to establish the fourth prong of the analysis—causation—and such finding was error.

**A. Henderson Waived Her Argument that Absences to Care for Her Sick Child are Protected Under the FMLA**

Henderson claims that she engaged in three protected activities: (1) being absent for several days during the first week of May 2011 due to her daughter's illness; (2) taking paid medical leave from May 12, 2011 through June 28, 2011; and (3) initiating FMLA leave on June 29, 2011 due to Chrysler's refusal to pay Henderson for additional medical leave. In response, Chrysler asserts that Henderson's FMLA retaliation claim fails for want of protected activity. In light of the following, Henderson waived her argument that her first alleged protected activity—absences in May 2011 related to her daughter's illness—was protected under the FMLA.

The first alleged protected activity was not raised in her amended complaint. She first claimed that she was subject to retaliation for missing work to care for her daughter in her response brief to Chrysler's motion for summary judgment. The district court found, and we agree, that Henderson waived this argument because her complaint did not provide Chrysler with sufficient notice that her FMLA retaliation claim was based, in part, on her absences in early May 2011 to care for her daughter. *See Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (recognizing that "[a] non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion" (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005))). Similar to the present case, in *Carter v. Ford Motor Co.*, 561 F.3d 562, 564-68 (6th Cir. 2009), we upheld the district court's decision to grant defendant's motion for summary judgment when the plaintiff claimed for the first time in her response brief that her FMLA claim was based on her 2005 termination and reinstatement instead of her final termination in 2006.

### B. Henderson Fails to Establish a *Prima Facie* Case of FMLA Retaliation

In considering whether Henderson established a *prima facie* case for FMLA retaliation based on her paid medical leave from May 12, 2011 through June 28, 2011, the district court assumed that Henderson's rheumatoid arthritis was a "serious health condition" under the FMLA and that her paid medical leave was protected under the FMLA—meaning Henderson satisfied the first requirement of her *prima facie* case. Additionally, the court assumed that Henderson established the third requirement—an adverse employment action—because she was not hired for the Model Planner position in December 2011. The district court found that Henderson failed to satisfy the second and fourth prongs—that the employer knew that she was exercising her rights under the FMLA and that there was a causal connection between the protected FMLA activity and the adverse employment action.

Assuming that Henderson's May 12, 2011 leave for treatment of rheumatoid arthritis or her June 2011 request for FMLA paperwork constitutes a protected activity, we agree with the district court that there is no causal connection between either of these activities and St. Pierre's decision not to hire Henderson for the Model Planner position. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). Henderson fails to satisfy the causal connection between a protected activity—taking paid medical leave for treatment for her rheumatoid arthritis commencing May 12, 2011 and concluding in June 2011 or requesting but not returning FMLA paperwork in June 2011—and her adverse employment action—not receiving the Model Planner position in December 2011.

The temporal proximity between the protected activity and the adverse employment action may be sufficient to establish a causal connection for establishing a *prima facie* case in certain circumstances. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523-25 (6th Cir. 2008). However, Henderson's situation is distinguishable from cases in which this court has determined that plaintiffs can establish causation based solely on temporal proximity. In *Mickey*, we discussed the distinction:

> Where an adverse employment action occurs *very close in time after an employer learns of a protected activity*, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, *the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality*.

516 F.3d at 525 (emphasis added).

Here, the passage of six to seven months between any protected activity—depending on whether one calculates from the time Henderson took leave for treatment for her rheumatoid arthritis or returned to work and requested FMLA paperwork—and the adverse employment action is not "very close" in time, and without more, cannot sustain an inference of a causal connection. *See Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (holding that, because the alleged adverse employment action occurred two to five months after the protected activity, the "loose temporal proximity" is "insufficient to create a triable issue").

Most of the evidence that Henderson offered to buttress the temporal connection predates her May 10, 2011 phone call to Delikat to inform him that she had rheumatoid arthritis and of her intent to take leave for treatment of her condition. The evidence shows at most that Henderson's supervisors disapproved of Henderson's taking leave that, for purposes of this appeal, was not FMLA-protected. But it does not suggest hostility to FMLA leave in general or

Henderson's FMLA leave in particular. The one piece of evidence that post-dates her notice to Delikat and pre-dates the adverse employment action is a May 11, 2011 email chain between Wicker and Delikat in response to Henderson's email announcement to Wicker, and others, of her immediate extended period of leave. At that time, Delikat expressed some concerns to Wicker about Henderson because "she's leaving abruptly today and we don't have a confirmed date for [her position to be outsourced], we thought it might be beneficial to her customers to know she was not going to be here. I agree it may be confusing but she put us in this position, hopefully there's minimal to no disruption." And that email pre-dates Henderson's June 2011 request for FMLA paperwork. Even viewed in the light most favorable to Henderson as the nonmoving party, the email exchange at most tends to show a natural concern with the business consequences that her unforeseen and extended period of absence might create. That concern falls short of any retaliatory intent and fails to cure the weakness of the alleged temporal connection.

Moreover, Henderson cannot establish a prima facie case of FMLA retaliation based on a "cat's paw" theory of liability. The Supreme Court recently defined the "cat's paw" theory of liability as follows: "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *Staub v. Proctor Hosp.*, 131 S. Ct 1186, 1194 (2011) (internal footnote omitted).

As a threshold matter, we have not applied the "cat's paw" theory to an FMLA case. Generally, our application of or reference to the "cat's paw" theory has been in cases brought under Title VII for discrimination on the basis of race, color, religion, sex and national origin. We have also recognized the cat's paw theory of liability for a claim brought under the Uniform

Service Employment and Reemployment Rights Act ("USERRA"). *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 755-56 (6th Cir. 2012). Significantly, however, the Supreme Court in *Staub* applied the cat's paw theory to a claim brought under the USERRA and noted that "[t]he statute is very similar to Title VII, which prohibits employment discrimination 'because of . . . race, color, religion, sex, or national origin.'" 131 S. Ct. at 1191 (quoting 42 U.S.C. §2000e-2(a)) (emphasis added). Moreover, when considering retaliation claims, we have stated that "the availability of cat's paw theory to impute knowledge of a protected activity to the decisionmaker is less than clear under this court's precedent . . . ." *Vander Boegh v. EnergySolutions, Inc.*, 536 F. App'x 522, 532 (6th Cir. 2013); *see Arendale v. City of Memphis*, 519 F.3d 587, 603-04 & n.13 (6th Cir. 2008) (recognizing "cat's paw" as a theory of imputing discriminatory bias under Title VII).

Henderson has not cited any case that applies the cat's paw theory of liability to impute knowledge of a protected activity. The facts in this case do not require us to decide whether to extend the cat's paw theory to FMLA retaliation cases. Assuming without deciding that the cat's paw theory of liability is available in FMLA retaliation cases, Henderson has failed to show that anyone in the relevant chain of communications possessed the requisite retaliatory intent.

To avail herself of the "cat's paw" theory, Henderson must prove that Delikat "perform[ed] an act motivated by [retaliatory] animus that [wa]s intended by the supervisor to cause an adverse employment action." *Staub*, 131 S. Ct. at 1194. The record does not support an inference that Delikat harbored retaliatory animus toward Henderson because she took FMLA-protected medical leave. Delikat's negative review to Franson of Henderson's performance has ample support in the record from her supervisors and her customers. In particular, because many of these complaints related to absences not at issue in this appeal and to

her failure to arrange for these absences, Delikat's references to "attendance" issues in his report to Franson could not reasonably have referred to Henderson's protected leave in May rather than these earlier problems. There is no evidence that Franson was motivated by retaliatory animus intended to cause an adverse employment action. It is undisputed that Franson never communicated with Henderson or knew anything about her medical condition or medical leave.

Likewise, St. Pierre was not hostile toward Henderson's rheumatoid arthritis leave in May 2011. In fact, it is undisputed that St. Pierre was unaware that Henderson had rheumatoid arthritis or that she took FMLA protected leave for her rheumatoid arthritis treatment in May 2011. St. Pierre provided undisputed testimony that he never spoke with Henderson or anyone at Chrysler about any leaves that she may have taken while employed at Chrysler. Moreover, it was undisputed that St. Pierre was the sole decision maker in determining whether to hire Henderson for the Model Planner position in December 2011. Even though St. Pierre testified that but for the information he learned from Franson he would not have removed Henderson from the offer pool, absent evidence that Delikat or Franson was motivated by retaliatory animus intended to have St. Pierre withdraw the offer, the cat's paw theory fails. *See Staub*, 131 S. Ct. at 1194.

No reasonable juror could find that Henderson did not receive the Model Planner position either because of her paid leave in May 2011 for treatment of her rheumatoid arthritis or because she requested but did not return FMLA paperwork in June 2011. Accordingly, the district court did not err in finding that Henderson failed to establish a *prima facie* case of FMLA retaliation.

**II.**

"The ADA makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of disability.'" *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir.

2013) (quoting 42 U.S.C. § 12112(a)). The PWCDRA "substantially mirrors the ADA." *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)). Consequently, "claims under both statutes are generally analyzed identically." *Steward v. New Chrysler*, 415 F. App'x 632, 641 (6th Cir. 2011). Therefore, like the district court, we analyze Henderson's claims under the ADA and the PWCDRA together.

We also apply the *McDonnell Douglas* burden-shifting test when a plaintiff tries to establish disability discrimination under the ADA and the PWCDRA through circumstantial evidence. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008). "The initial burden is on the plaintiff to make out a prima facie case, which under the ADA requires a showing that 1) the plaintiff was protected under the ADA; 2) the defendant knew the plaintiff was protected; 3) the defendant took an adverse action against the plaintiff; and 4) there was a causal connection between the adverse action and the plaintiff's protected status." *Bailey v. Real Time Staffing Servs.*, 543 F. App'x 520, 523 (6th Cir. 2013). If Henderson establishes a *prima facie* case for discrimination under the ADA and the PWDCRA, then the burden shifts to Chrysler to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). If Chrysler makes that proffer, then the burden shifts back to Henderson to show by a preponderance of the evidence that Chrysler's proffered reason is merely a pretext for discrimination. *Id.*

Chrysler does not dispute that rheumatoid arthritis is a "disability" within the meaning of the ADA and the PWDCRA, but rather it argues that Henderson cannot establish a *prima facie* case of disability discrimination because she cannot show that Franson or St. Pierre had knowledge of her disability and thus there is no causal connection between Henderson's

disability and St. Pierre's decision not to hire Henderson for the Model Planner position. By contrast, Henderson appears to argue that she did not receive the Model Planner position because Delikat knew she had rheumatoid arthritis.

Henderson relies again on the "cat's paw" theory of liability to impute knowledge of her disability to St. Pierre. As with the FMLA retaliation claim, we have not yet extended the cat's paw theory of liability to claims under the ADA. For the reasons discussed supra, any extension of the cat's paw theory to claims under the ADA would not aid Henderson because there is no evidence that anyone in the relevant chain of communications (Delikat to Franson to St. Pierre) was motivated by discriminatory animus intended to prevent her from receiving the Model Planner position.

Henderson attempts to salvage her theory by claiming that she informed Wicker in September 2010 that she suspected that she had rheumatoid arthritis. But Wicker's addition to the chain of communications also fails to establish the requisite knowledge. Although Henderson claims that she was formally diagnosed later that month, she does not point to any medical records in the record to confirm the diagnosis, and there is no evidence that she ever told Wicker that she was diagnosed with rheumatoid arthritis. Henderson appears to assert on appeal that the cat's paw theory applies to her ADA claim not only because of Delikat's knowledge of her rheumatoid arthritis, but also because of Wicker's knowledge. There is no evidence that Wicker shared the fact that Henderson might have rheumatoid arthritis with Delikat or anyone at Chrysler. The evidence shows that Wicker's performance reviews of Henderson was based on feedback that she received from Henderson's supervisors and customers over a two-year period––much of which occurred prior to September 2010. Not only does Wicker lack the requisite

discriminatory animus, but any cat's paw theory based on incorporating Wicker into the chain—

Wicker to Delikat to Franson to St. Pierre—becomes even more attenuated.

Because Henderson has failed to establish that anyone in the relevant chain of communications was motivated by discriminatory animus, she cannot prevail on a cat's paw theory of liability. Thus, the district court properly found that Henderson failed to establish a prima facie case of disability discrimination.

### III.

Henderson's final argument on appeal is that the district court's grant of summary judgment should be reversed because Chrysler's reasons for not hiring her for the Model Planner position were merely a pretext for retaliation and discrimination. Because we hold that Henderson failed to establish a *prima facie* case of FMLA retaliation or of discrimination under the ADA or the PWCDRA, we need not address Henderson's final argument.

**AFFIRMED.**