RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

PRIANKA BOSE,

　　　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

ROBERTO DE LA SALUD BEA; RHODES COLLEGE,

　　　　　　　　　　　　　*Defendants-Appellees*.

┐
│
│
│
├  No. 18-5936
│
│
│
┘

─────────────

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:16-cv-02308—John Thomas Fowlkes, Jr., District Judge.

Argued: May 9, 2019

Decided and Filed: January 28, 2020

Before: SILER, LARSEN, and NALBANDIAN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Adam W. Hansen, APOLLO LAW LLC, Minneapolis, Minnesota, for Appellant.
Lisa A. Krupicka, BURCH, PORTER & JOHNSON, PLLC, Memphis, Tennessee, for
Appellees. **ON BRIEF:** Adam W. Hansen, Eleanor E. Frisch, APOLLO LAW LLC,
Minneapolis, Minnesota, Bryce Ashby, DONATI LAW, PLLC, Memphis, Tennessee, for
Appellant. Lisa A. Krupicka, Gary S. Peeples, Sarah E. Smith, BURCH, PORTER &
JOHNSON, PLLC, Memphis, Tennessee, for Appellees.

─────────────

## OPINION

─────────────

　　　　LARSEN, Circuit Judge. Rhodes College expelled Prianka Bose after her organic
chemistry professor, Dr. Roberto de la Salud Bea, accused her of cheating on tests and quizzes.

Bose says that Bea fabricated these charges after she confronted Bea regarding inappropriate comments and questions Bea had posed to her. Bose brought numerous claims against both Rhodes and Bea, including a Title IX claim against Rhodes and a state law defamation claim against Bea. We agree with the district court that Bose's Title IX claim cannot succeed, but with respect to the defamation claim, we conclude that the district court erred by holding that Bea's statements were subject to absolute privilege under Tennessee law. Accordingly, we AFFIRM in part and REVERSE in part.

I.

We recite the facts in the light most favorable to Bose. Rhodes College is a liberal arts institution in Memphis, Tennessee that receives federal funds. In the fall of 2013, Bose enrolled as a freshman at Rhodes. During her sophomore year, she was accepted into the early selection program for George Washington University's medical school. The program guaranteed Bose admission, without taking the MCAT, if she met certain requirements, including maintaining a 3.6 GPA and receiving at least a B- in required science courses.

In the spring semester of her sophomore year, Bose successfully completed Bea's course, Organic Chemistry I. The following summer, Bea approached Bose in a parking lot on campus, where the two struck up a conversation. After exchanging pleasantries, Bea began asking more personal questions: he asked Bose how she liked to spend her evenings and free time, whether she spent time with friends, and whether she spent time with her boyfriend. As he asked her questions, Bea moved closer to Bose, who eventually stepped backward to create space between them. Bose, who had never mentioned having a boyfriend to Bea, said she had to leave. Bea then asked her whether she would like to have dinner and catch up. Bose later testified that she believed Bea was asking her out on a date, which made her uncomfortable. Bose declined the dinner invitation and left.

Bose took Bea's Organic Chemistry II class the following fall semester as she had planned. Throughout the term, Bea called Bose "pretty" or "beautiful" and would compliment her clothing. During this same semester, Bose took a corresponding lab course with a different professor. Bea regularly visited the lab, starting conversations with Bose and offering to help

her; he did not give the same attention to other students. Once, Bea called Bose to his office after class and asked her whether she would like to be his research assistant; Bose said she would think about it. Bea then asked Bose if she liked to party on campus. When Bose left, Bea followed her and said he would walk her wherever she needed to go. Although Bose said that was not necessary, Bea walked her out anyway.

Throughout the semester, Bea gave all of his students the option to take tests and quizzes early. Bose often used this option. She would arrive at Bea's office around 7:30 or 7:45 a.m.; Bea would give her the test and leave shortly before 8:00 a.m. to teach another class. When he left, Bea would leave his laptop running without logging off, which meant the laptop could be accessed without his password.

In early November 2015, Bose took a quiz in Bea's office. Bose testified that Bea was in the office with her nearly the entire time she took the quiz, leaving only momentarily to collect class evaluations. Bea testified that when he returned to his office, he noticed that the answer key was open on his laptop in a larger view or "zoom" level than he typically uses. Bea explained that he then began to suspect Bose was cheating.

On November 19, 2015, Bose was sitting with a friend in the school cafeteria when Bea approached. Bea leaned over Bose's shoulder and asked sternly whether she was texting her boyfriend. Bose did not answer; Bea smiled and walked away. Later that same day, Bose and her friend approached Bea. Bea seemed happy to see Bose, but that changed when Bose confronted him, saying: "[L]ook, Dr. Bea, I don't know if you mean it this way, but I feel really uncomfortable when you ask me questions about my boyfriend, when you ask me anything about my family, I don't want personal questions, I want to keep our relationship strictly professional." Bea said nothing, looked at the ground, and walked away.

An Organic Chemistry exam was scheduled for the next day (Exam 3). Bose, who woke with a cough and fever, asked to take the exam in Bea's office to avoid disturbing the other students. Bea printed out the exam and tossed it on the desk without saying anything to Bose, which was out of character for him. Bea also logged out of his laptop before leaving the office.

When Bea returned, he found his office door shut, which caused it to lock automatically, though the door was usually left ajar when a student took a test in the office. Bea used his key to open the door and found Bose standing beside his desk. Bose testified that she had risen to open the door when she heard Bea trying to come in. Bea asked Bose whether she needed scratch paper; she said no, and Bea left. Distracted by maintenance noise near Bea's office, Bose finished the exam with the rest of the class. Bose scored 74 points out of 100, approximately 20 points lower than her score on any other quiz or test in Organic Chemistry II, but Bea recorded her score as 47.

The next week, Bose attempted to ask Bea about some practice problems before class began, but he refused to respond to her; when he eventually acknowledged her, he just shrugged his shoulders. Bose had regularly asked for help with practice problems in the past, and Bea had never refused to respond. Feeling uneasy with his changed behavior, Bose went to Bea's office after class; but Bea was again unresponsive. Eventually, Bose broke the silence by relaying her impression that Bea had seemed disinterested in teaching or helping her since she had spoken to him about the cafeteria incident. Bea still said nothing, so Bose left.

Around this time, Bea told a colleague that he suspected a student of cheating. The colleague advised Bea to create a fake answer key and stay logged in on his computer to see whether the student used it. Bea testified that he took this advice, creating a document entitled "Answer Key," with credible, though incorrect, answers to an upcoming quiz (Quiz 5). Shortly thereafter, Bose took Quiz 5 in Bea's office. Her answers matched the fake answer key precisely. Later that day, Bea emailed several administrators and accused Bose of cheating and of changing her grades in his grade roster. Bose would later deny these claims, maintaining that Bea must have matched his "fake answer key" to her actual answers, rather than the other way around.

*Rhodes College Proceedings*. Student academic conduct at Rhodes is governed by an Honor Code, administered by students elected to serve on an Honor Council. Two days after Bose took Quiz 5, the Honor Council president emailed Bose to tell her she was under investigation for cheating "on multiple assignments in Organic Chemistry II." After an investigation and hearing, the Honor Council determined that Bose had violated the Honor Code.

Among other things, the Honor Council "found clear and convincing evidence that [Bose] had stolen answers, most convincingly on Quiz 5, from Dr. Bea's computer and used them to cheat." Because of the "nature and severity" of the underlying offense, as well as what the Council deemed Bose's "egregious lies" during the hearing, the Honor Council voted to expel her.

Bose appealed her expulsion to the Faculty Appeals Committee. The Appeals Committee upheld the Honor Council's finding but remanded for reconsideration of the penalty, in light of new evidence in the form of tests and quizzes that Bose had previously lost.[1] On remand, the Honor Council upheld Bose's expulsion.

In February 2016, Bose filed an internal Title IX complaint alleging sexual harassment by Bea. A Title IX investigator determined that the allegations of sexual harassment could not be sustained.

*The Lawsuit*. In May 2016, Bose filed this lawsuit against Rhodes and Bea. Against Rhodes she alleged, among other claims, breach of contract for failing to investigate pursuant to Rhodes' Title IX handbook, and retaliation in violation of Title IX, 20 U.S.C. §§ 1681–88. Against Bea she alleged, among other claims, defamation under Tennessee law for Bea's statements that Bose had violated the Honor Code.

Rhodes and Bea filed a motion to dismiss. Bea argued that his accusations of cheating and the documentary evidence submitted to the Honor Council were made as part of "quasi-judicial proceedings" and were therefore subject to an absolute privilege under Tennessee defamation law. The district court agreed and dismissed the defamation claim against Bea. But the district court allowed the Title IX and breach of contract claims to proceed to discovery.

After discovery, Rhodes moved for summary judgment on the breach of contract and Title IX claims. The court denied the motion on the breach of contract claim. The court granted summary judgment to Rhodes on the Title IX claim, however. Bose's Title IX theory was that Bea had reported her to the Honor Council in retaliation for her opposing his advances. But Title

---

[1]Bea had testified before the Honor Council that Bose had received a 47 on Exam 3 (though Bose actually received a 74). Bose could not dispute this, as she had lost the graded exam in an airport. Sometime after the hearing, the person who had found her exam mailed it back to her.

IX does not provide for individual liability; only "a recipient of federal funds may be liable in damages under Title IX" and "only for its own misconduct." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999); *see also Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999). Accordingly, Bose asked the court to impute Bea's retaliatory motive to Rhodes using a "cat's paw" theory of causation, which links the discriminatory motive of one actor to the adverse action of another.[2] The district court declined to do so, reasoning that the cat's paw theory depends on principles of respondeat superior and constructive notice that do not apply to Title IX claims. Bose later voluntarily dismissed her breach of contract claim with prejudice. She appeals only the district court's decisions dismissing her Title IX and defamation claims.

## II.

We first address the district court's grant of summary judgment to Rhodes on Bose's Title IX claim. We review de novo, viewing the facts in the light most favorable to the non-moving party. *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 532, 534 (6th Cir. 2008).

## A.

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Though the statute contains no express private right of action, the Supreme Court has held that individuals may sue funding recipients for violating Title IX. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 76 (1992). And the Court has held that this implied right of action includes retaliation claims, explaining that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

---

[2]According to the Supreme Court, "[t]he term 'cat's paw' derives from a fable conceived by Aesop. . . . In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011).

The Supreme Court's decision in *Jackson* did not spell out the elements of a Title IX retaliation claim, and no published case in this circuit has decided the question. In unpublished authority, however, we have analogized to Title VII retaliation claims, stating that a Title IX plaintiff must show "that (1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017). Our sister circuits apply similar tests. *See, e.g.*, *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002). And the parties have litigated this case under that framework, which we apply here.

In this case, Bose cannot make out the fourth element—causation. Bose's theory is that after she opposed Bea's unwelcome attention by confronting him in the cafeteria and asking him to "keep things professional,"[3] he retaliated by taking her to the Honor Council on false allegations of cheating. But there is no individual liability under Title IX, so Bose cannot use Title IX to sue Bea directly for his alleged retaliatory act. *See Soper*, 195 F.3d at 854. Moreover, the "adverse school-related action" she alleges is her expulsion, and Rhodes itself did that, not Bea. Yet there is no evidence that Rhodes itself (or the Honor Council or the Faculty Advisory Committee) harbored any discriminatory motive against Bose. To draw the required connection between Bose's opposition to Bea's unwelcome conduct and Rhodes' act of expelling her, Bose seeks to impute Bea's retaliatory motive to Rhodes using a cat's paw theory.

We have explained the cat's paw theory this way:

> "[T]he term 'cat's-paw' refers to 'one used by another to accomplish his purposes.' In the employment discrimination context, 'cat's paw' refers to a

---

[3]In the Title VII context, we have held that under that statute's "opposition clause," 42 U.S.C. § 2000e-3(a), an employee's "demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII." *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015). Noting that "the language of the opposition clause does not specify to whom protected activity must be directed," we rejected the suggestion that "communication directed solely to a harassing supervisor does not constitute protected activity." *Id.* at 1068 (noting disagreement with *Frank v. Harris County*, 118 F. App'x 799, 804 (5th Cir. 2004)). The parties have not questioned whether this view of protected activity also applies to claims brought under Title IX, and we express no position on that question here.

situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citations omitted). A plaintiff alleging liability under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011).

*Marshall v. The Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017) (alteration in original). This court has applied the cat's paw theory to a variety of claims, including a Family Medical Leave Act discrimination claim, a Title VII race discrimination claim, and an Age Discrimination in Employment Act claim. *See id.* (collecting cases). Our question today is whether the cat's paw theory can apply in Title IX cases. We hold that it cannot.

Our conclusion follows from the Supreme Court's decision in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). In *Gebser*, the Court considered whether a school district could be held liable under Title IX for failing to stop a teacher's sexual harassment of a high school student. *Id.* at 277. Though the school had been unaware of the harassment, Gebser argued that Title IX imposed liability on the school under either a respondeat superior or constructive notice theory. *Id.* at 282. The Court disagreed, concluding that Title IX imposed liability only for a funding recipient's "own official decision[s]" and not "for its employees' independent actions." *Id.* at 290–91. Accordingly, the Court held, "a damages remedy will not lie under Title IX unless an official who at a minimum has the authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination" and responds with "deliberate indifference." *Id.* at 290.

The Court gave several reasons for its holding. First, it noted that while "agency principles guide the liability inquiry under Title VII," that conclusion derives from Title VII's text, which "explicitly defines" a liable "'employer' to include 'any agent.'" *Id.* at 283 (quoting 42 U.S.C. § 2000e(b)). By contrast, "Title IX contains no comparable reference to an educational institution's 'agents,' and so does not expressly call for application of agency principles." *Id.* Moreover, the Court concluded, "[I]t would frustrate the purposes of Title IX to permit a damages recovery against a school district . . . based on principles of respondeat superior or constructive notice." *Id.* at 285 (emphasis and quotation marks omitted).

The Court noted that, under Title IX's express means of enforcement, through administrative action, "an agency may not initiate enforcement proceedings until it 'has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.'" *Id.* at 288 (quoting 20 U.S.C. § 1682). The Court concluded that "[i]t would be unsound . . . for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 289. "Congress," the Court held, "did not envision a recipient's liability in damages in that situation." *Id.* at 287–88.

Cases since *Gebser* have reinforced its message: a "recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Davis*, 526 U.S. at 640. Accordingly, it is inappropriate to use "agency principles to impute liability to [a school] for the misconduct of its teachers," *id.* at 642; liability instead requires that the institution itself be "deliberately indifferent to known acts of . . . discrimination," *id.* at 643. *See also Jackson*, 544 U.S. at 181 ("Title IX's enforcement scheme also depends on individual reporting because individuals and agencies may not bring suit under the statute unless the recipient has received 'actual notice' of the discrimination." (quoting *Gebser*, 524 U.S. at 288)). Cat's paw liability, therefore, has no place in Title IX actions.

Under a cat's paw theory, the decisionmaker need not have notice of the subordinate's discriminatory purpose. The cat's paw theory, rather, imputes knowledge and discriminatory intent—the cat's paw is the "unwitting tool" of those with the retaliatory motive. *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 (6th Cir. 2014); *see also Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 496 (6th Cir. 2015); *Shazor v. Prof. Transit Mgmt., Ltd.*, 744 F.3d 948, 955–56 (6th Cir. 2014) (explaining that a cat's paw theory requires proof only that the subordinates intended to cause the discriminatory employment action and that those actions proximately caused the ultimate action). Indeed, we have referred to cat's paw as an application of "agency principles," *Marshall*, 854 F.3d at 378; *see also Volz v. Erie County*, 617 F. App'x 417, 423 (6th Cir. 2015), and have even called it the "rubber-stamp" theory. *Bishop v. Ohio*

*Dep't of Rehab. and Corr.*, 529 F. App'x 685, 696 (6th Cir. 2013); *see also Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 586 (6th Cir. 2014). Cat's paw liability does not require either actual notice to the funding recipient or any "official decision" by it; to hold a cat's paw theory applicable to Title IX claims then would be inconsistent with the Supreme Court's decisions in *Gebser*, *Davis*, and *Jackson*. *See also M.D. ex rel. Deweese v. Bowling Green Ind. Sch. Dist.*, 709 F. App'x 775, 779 (6th Cir. 2017) (recognizing that a plaintiff raising a Title IX retaliation claim cannot use agency principles to impute liability to a funding recipient for the misconduct of its employees).

Bose suggests that the cat's paw theory does not require the application of respondeat superior principles. Rather, says Bose, "the cat's paw theory is a doctrine of causation; it simply draws a causal link between the discriminatory animus of one individual and the adverse action of another." According to Bose, cat's paw does not impute liability; it is merely a "conduit theory." *See Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 878 (6th Cir. 2001). We fail to see the distinction. The Supreme Court in *Gebser* held that an educational institution is responsible under Title IX only for its "own official decision[s]." 524 U.S. at 290–91. Bose argues that she seeks to hold Rhodes liable for its own decision—expelling her. But that decision only violated Title IX if it was made "on the basis of sex"—that is, if the decision was taken for a discriminatory reason. Bose has no evidence of any discriminatory motive on Rhodes' part; she, therefore, asks us to hold Rhodes responsible for *Bea's* retaliatory animus. But that would be to hold Rhodes liable "for its employees' independent actions"—precisely what *Gebser* forbids.[4]

Bose asks us to follow the Second Circuit's decision in *Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81 (2d Cir. 2011), which she reads as applying a cat's

---

[4]Bose argues that this court has permitted liability under a cat's paw theory for claims brought under 42 U.S.C. § 1983, despite the fact that respondeat superior liability does not apply to such claims. Although Bose offers two cases in support, neither case held, in a binding, considered opinion, that the cat's paw theory applies to § 1983 claims. In *DeNoma v. Hamilton County Court of Common Pleas*, 626 F. App'x 101 (6th Cir. 2015), a panel of this court applied a cat's paw theory to the plaintiff's § 1983 claim. The opinion, however, is unpublished, and it does not appear that the court had occasion to consider whether a cat's paw theory was appropriate for § 1983 claims, given that the lower court and the parties had proceeded as if it were. *See id.* at 105. Likewise, in *Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008), this court seemed to assume the applicability of the cat's paw theory to § 1983 claims. *See id.* at 604 n.13. But the court resolved the case on other grounds—that the plaintiff "has not demonstrated that he was treated differently than similarly situated non-white employees." *Id.* at 604.

paw theory to a Title IX retaliation claim. There, a college's Honor Code Panel expelled Papelino after concluding that he had cheated on an exam. *Id.* at 87. Papelino claimed that a professor had initiated the Honor Code proceedings in retaliation for his having reported the professor's sexual harassment to the College's Associate Dean for Student Affairs, Albert White. Papelino brought a Title IX retaliation suit against the College. *Id.* at 88. The Second Circuit allowed the retaliation claim to proceed to trial. *Id.* at 92.

Some aspects of the Second Circuit's decision can indeed be read as invoking a cat's paw theory, though the court never uses the term. The court concluded, for example, that, "even if the [Honor Code] Panel members were themselves unaware that Papelino had engaged in protected activity," a reasonable jury could find that "they were acting on [the professor's] explicit encouragement, or that they acted without information that White should have imparted to them." *Id.* at 92–93. Read this way, the Second Circuit may have seen the Honor Code Panel as the cat's paw, unwittingly manipulated by the retaliatory animus of either the professor or Dean White, or both. To the extent *Papelino* embraces the cat's paw theory of causation for Title IX claims, we find it inconsistent with *Gebser*, *Davis*, and *Jackson* and decline to follow it.

Yet other aspects of *Papelino* suggest a different theory of Title IX liability—that the College was on notice of, and was deliberately indifferent to, the professor's retaliation. There, the student had reported his professor's sexual harassment to Dean White.[5] The court considered this act of reporting to be both the "protected activity," and evidence that the College knew that Papelino had engaged in protected activity. *Id.* at 92. There was also evidence that the Dean had informed the professor of Papelino's complaint against her and that the Dean knew that the professor had initiated the Honor Code proceedings against Papelino shortly after she learned of Papelino's complaint. Yet despite the fact that Dean White was "a high-ranking member of the College's administration who was 'responsible for the administration of the Student Code,'" *id.* at 89, he "did nothing even after the cheating charges were lodged against Papelino," *id.* at 92;

---

[5]The court, in another part of the opinion, expressed its view that reporting to the Dean satisfied *Gebser*'s requirement that notice be given to an "appropriate person"—"a school official with 'authority to address the alleged discrimination and to institute corrective measures.'" *Papelino*, 633 F.3d at 89; *see also id.* (finding that Papelino's complaint to Dean White put the College on "actual notice" of the harassment because "White was a high-ranking member of the College's administration who was 'responsible for the administration of the Student Code'").

*see also id.* at 93 (suggesting that Dean White—perhaps because of his supervisory role with respect to the Honor Code—had a duty to "impart[]" his knowledge of the professor's retaliatory act to the Honor Code panel). Read this way, it was the College's *own* behavior—its deliberate indifference to the professor's known retaliatory act—that subjected the College to Title IX liability in *Papelino*.

In her reply brief on appeal, Bose attempts to raise a similar theory: that Rhodes had actual notice of Bea's retaliation against her for opposing his unwanted advances but was deliberately indifferent to it. According to Bose, she told the Honor Council in her closing statement about possible retaliation by Bea and repeated her claim to the Faculty Appeals Committee and the Title IX investigator; yet none took any action. But if she ever previously presented such a theory of Title IX liability in this litigation, she has since abandoned it.

In its motion for summary judgment, Rhodes asked the district court to dismiss Bose's Title IX claim in full. In response, Bose raised the cat's paw theory of liability but made no mention of any deliberate indifference by Rhodes to Bea's retaliation. In its reply, Rhodes stated that Bose had abandoned any deliberate indifference claim she might have pled. The district court's order dismissing Bose's Title IX claim in full did discuss, and dismiss, Bose's claim that Rhodes had been deliberately indifferent to Bea's *sexual harassment*; Bose did not appeal that decision. The district court did not, however, discuss any theory whereby Rhodes would be liable for its own deliberate indifference to Bea's *retaliation*. With respect to the retaliation claim, the district court discussed the cat's paw theory, which it rejected.[6] If Bose believed she had an outstanding theory of Title IX liability that the district court had failed to consider, then would have been the time to raise it, given that the district court had just dismissed her Title IX claim in full. Yet, Bose did not file a motion for reconsideration, alerting the district court that it had failed to consider an alternate theory of liability. Nor did she make any mention of a deliberate-indifference-to-retaliation theory in her opening brief in this court; her opening brief advanced only the cat's paw theory. Only after Rhodes again noted, in its responsive brief on

---

[6]The district court also rejected Bose's argument that the court was bound by its causation ruling at the preliminary injunction stage, correctly noting that "the findings of a district court in the context of a preliminary injunction do not bind th[e] court in subsequent proceedings."

appeal, that Bose had "forfeited" any deliberate indifference claim did Bose make any attempt to develop the theory that Rhodes should be held liable for its own deliberate indifference to Bea's retaliation. That was too late. And even then, at oral argument, Bose's counsel seemed to retreat, arguing that the cat's paw theory is "the only theory of causation there could be in this case." We conclude, therefore, that Bose has forfeited any argument that Rhodes had actual notice of Bea's retaliation but was deliberately indifferent to it. *See Am. Trim, LLC v Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004) ("This argument was raised for the first time in [appellant's] reply brief, and this court has consistently held that we will not consider such arguments."); *Coach Servs., Inc. v. Source II, Inc.*, 728 F. App'x 416, 417–18 (6th Cir. 2018) (finding that the defendants forfeited arguments where they failed to raise them both in response to a motion for summary judgment and in their motion for reconsideration of the district court's summary judgment ruling).

We do not speculate whether the outcome would have been different had Bose pursued a theory that Rhodes was deliberately indifferent to Bea's known retaliation. But had Bose pursued such a theory in the district court, we imagine that a number of questions would have been joined. For example: was the Honor Council, the Faculty Advisory Committee, or the Title IX investigator an "appropriate person" to notify, within the meaning of Title IX? *See Gebser*, 524 U.S. at 289. Assuming so, did Bose adequately inform those entities of the alleged retaliation? And, if so, was Rhodes' response "clearly unreasonable" in light of what Rhodes knew? *Williams ex rel Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 367–68 (6th Cir. 2005). And, for that matter, is deliberate indifference to retaliation even actionable under Title IX? *See M.D. ex rel. Deweese*, 709 F. App'x at 779 ("M.D. has failed to cite any authority applying the . . . deliberate indifference framework to a Title IX retaliation claim."); *but see Feminist Majority Found. v. Hurley*, 911 F.3d 674, 695 (4th Cir. 2018) ("[W]e are satisfied that an educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment."). Bose's failure to advance a deliberate-indifference-to-retaliation theory below deprives us of the ability to review these questions on appeal.

Throughout this litigation, Bose chose to argue that the cat's paw theory applies to Title IX claims. We conclude that it does not. The cat's paw theory, which imputes the discriminatory animus of another to the funding recipient, is inconsistent with Title IX principles requiring that a funding recipient be held liable "only for its own misconduct." *Davis*, 526 U.S. at 640. As a result, we affirm the district court's order granting summary judgment to Rhodes on the Title IX claim.

III.

We next turn to the district court's dismissal of Bose's defamation claim for failure to state a claim. We review such decisions de novo, accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff. *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 785 (6th Cir. 2016).

The district court granted Bea's Rule 12(b)(6) motion on the ground that Bea's statements were absolutely privileged under Tennessee defamation law because they were made in a quasi-judicial proceeding. We cannot agree. Tennessee does recognize an absolute privilege for statements made in quasi-judicial proceedings. *See Lambdin Funeral Serv. Inc. v. Griffith*, 559 S.W.2d 791, 792 (Tenn. 1978); *Logan's Super Mkts., Inc. v. McCalla*, 343 S.W.2d 892, 894–95 (Tenn. 1961). But the Tennessee cases have applied this privilege only to statements made before public bodies. In *Evans v. Nashville Banner Public Co.*, for example, the court clarified that Tennessee had expanded the quasi-judicial absolute privilege to "proceedings conducted by *state* departments and agencies." No. 87-164-II, 1988 WL 105718, at *3 (Tenn. Ct. App. Oct. 12, 1988) (emphasis added). And in *Jones v. Trice*, the Tennessee Supreme Court approvingly cited the English rule, which specified that the absolute privilege is "limited to legislative and judicial proceedings *and other acts of state*." 360 S.W.2d 48, 51 (Tenn. 1962) (emphasis added).

The rationale underlying the Tennessee decisions supports limiting this privilege to statements made to public entities. Time and again, the Tennessee courts have emphasized that a benefit to the public is what drives the privilege. In *Independent Life Insurance Co. v. Rodgers*, 55 S.W.2d 767 (Tenn. 1933), the Tennessee Supreme Court concluded that statements made in a

letter to the state insurance commissioner were absolutely privileged as part of a quasi-judicial license revocation proceeding. *Id.* at 768. According to the Court, the insurance commissioner had been clothed by statute "with attributes similar to those of a court"; the statute had thereby made "of him a court to determine this matter of revocation." *Id.* at 769. The Court recognized that "absolute privilege . . . has been extended to many inquiries that are not conducted before courts of justice or courts of record," including "to statements made in a court martial; to statements made in an extradition proceeding before the Governor; to proceedings before the interstate commerce commission; to affidavits for a search warrant made before a justice of the peace; to preliminary statements of a witness made to counsel before trial; and . . . to statements made upon the hearing of applications for pardon to the Governor." *Id.* (internal citations omitted). Common to all these proceedings is that they were public.

In *Lambdin*, the Tennessee Supreme Court extended an absolute privilege to statements made to the Tennessee Board of Funeral Directors and Embalmers, which concerned "the occupation for which [the plaintiffs] had been licensed by the Board." 559 S.W.2d at 792. As in *Rodgers*, the Court in *Lambdin* emphasized that the basis of this privilege was public need. *Id.* And in *Evans*, the Tennessee Court of Appeals emphasized the benefit of free dialogue in statements before zoning boards. 1988 WL 105718 at *4. The court explained that "[t]he policy underlying the privilege is to encourage the public to speak freely at public, governmental hearings," as "[l]ocal boards of zoning appeals take actions which affect not only homes and neighborhoods but also the quality of people's lives" and "[w]hen these boards hold hearings, all interested persons should feel free to express their views without fear of a recriminating lawsuit." *Id.*

A common theme emerges from the cases in which Tennessee has recognized an absolute privilege—a strong benefit to the public, often tied to a statute or to powers which the Tennessee legislature had specifically granted to the tribunal at issue. *See id.; see also Rodgers*, 55 S.W.2d at 770 ("The design of [the statute at issue] will be obstructed if those instituting or participating in proceedings to bring about the revocation of the license of an unworthy agent may be subjected by reason of their statements to a suit for libel or a suit for slander."); *Logan's Super*

*Mkts., Inc.*, 343 S.W.2d at 894 ("The privilege belongs to the public, not to the individual, and the public should not stand to lose the benefit it derives . . . .").

Bea cannot point to a similar *public* benefit to Rhodes' disciplinary proceedings. While Bea claims that the public has an interest in a college's academic misconduct proceedings, and that private colleges have an interest in encouraging faculty members and students to report allegations of academic misconduct, whether a student is disciplined by a private college does not affect the citizens of the state in the same fashion as, for example, revoking a business's publicly conferred license, passing zoning laws, or drafting legislation in response to public testimony.

Bea discusses at length the procedural safeguards required in an Honor Council proceeding, but we see nothing in the Tennessee cases that would suggest that procedural safeguards alone are enough to cloak participants in a private proceeding with an absolute privilege under Tennessee law. Bea refers us to *Brundage v. Cumberland County*, 357 S.W.3d 361, 370 (Tenn. 2011), in which the Tennessee Supreme Court declared that "[t]he application of pre-defined standards, the requirement of a hearing, and the requirement of a record are earmarks of quasi-judicial proceedings." But the proceedings at issue in *Brundage* were plainly public— "a local legislative body's land use decision." *Id.* at 363. Moreover, the question in *Brundage* had nothing to do with whether an absolute privilege applied to statements made in such proceedings. *Brundage* instead concerned the standards for seeking judicial review of such decisions under a particular Tennessee statute. *Id.* at 371. Along the way, the Court noted that the proceedings at issue were a "hybrid" between "essentially 'legislative'" and "'quasi-judicial' decisions," and discussed the characteristics of each. *Id.* at 370. But as the question there concerned the procedures for obtaining judicial review of plainly *public* proceedings, and did not concern the availability of an absolute privilege in *any* kind of proceeding, we cannot find in *Brundage* any indication that Tennessee would extend its absolute privilege beyond the realm of public proceedings where it has previously resided.

Finally, Bea notes that in *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 161 (Tenn. Ct. App. 1997), the Tennessee Court of Appeals said that "our Supreme Court [has] strongly endorsed a liberal application of the absolute privilege accorded to publication of defamatory

matters in connection with judicial proceedings." But the key word there is "judicial." In *Myers*, the court discussed whether an expert report made "in anticipation of" the defendant's role as an expert witness in state court litigation was absolutely privileged. *Id.* The court repeated the policy underlying absolute privilege for statements made in a *judicial* proceeding:

> Underlying this general doctrine of absolute immunity from liability in libel and slander for statements made in the course of a judicial proceeding is a policy decision by the courts that access to the judicial process, freedom to institute an action, or defend, or participate therein without fear of the burden of being sued for defamation is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of an individual to a legal remedy where he has been wronged thereby.

*Id.* (quoting *Jones*, 360 S.W.2d at 51). Thus, "liberal application" means only that courts should liberally apply the absolute privilege when a statement is connected to a judicial or quasi-judicial proceeding, not that courts should be generous in deciding what proceedings fit that definition.

To our knowledge, Tennessee has never cloaked defamatory statements made to private entities with an absolute privilege, and we see in the Tennessee cases no indication that its rationale for maintaining the privilege would compel an extension. Of course, the Tennessee legislature or the Tennessee courts might, in the future, choose another path. But "[o]ur respect for the role of the state courts as the principal expositors of state law counsels restraint by the federal court in announcing new state-law principles." *Angelotta v. Am. Broad. Corp.*, 820 F.2d 806, 809 (6th Cir. 1987). We conclude that Bea has failed to show that Tennessee would provide absolute immunity to statements made in Rhodes' Honor Council proceedings.[7] Accordingly, we reverse the district court's decision dismissing Bose's defamation claim on this ground.

\* \* \*

We AFFIRM the district court's grant of summary judgment as to Bose's Title IX claim but REVERSE and REMAND regarding Bose's defamation claim.

---

[7]Bea argues, for the first time on appeal, that Bose's defamation claim fails because she cannot show publication, an element of defamation under Tennessee law. But because the defamation claim was dismissed at the Rule 12(b)(6) stage, it was never subject to discovery. Counsel for Bea admitted at argument that publication is a fact-specific issue, and there has been little factual development of this claim. We decline to address this issue for the first time on appeal.